## JOY *v.* ST. LOUIS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES ·FOR
THE EASTERN DISTRICT OF MISSOURI.

No. 106.   Argued December 9, 10, 1890. — Decided January 19, 1891.

In this case it was held that, under two agreements made August 11, 1875, one between the St. Louis County Railroad Company and the St. Louis, Kansas City and Northern Railway Company, and the other called the "tripartite agreement," between the Commissioners of Forest Park in the city of St. Louis, the said County company and the said Kansas City company, and a deed of the same date from the former company to the latter company, the Wabash, St. Louis and Pacific Railway Company was bound to permit the St. Louis, Kansas City and Colorado Railroad Company to use its right of way from the north line of Forest Park, through the park, to the terminus of the Wabash company's road, at Union Depot, on Eighteenth Street, in St. Louis, for a fair and equitable compensation.

The covenants in paragraph 9 of the tripartite agreement, as to the use of the right of way by other railroad companies, are binding upon subsequent purchasers, with notice, from the Kansas City company.

That agreement being a link in the chain of title of the appellants, they must be held to have had notice of its covenants, and are bound by them, whether they be or be not strictly such as run with the land.

Paragraph 9 of the tripartite agreement created an easement in the property of the County company and the Kansas City company, for the benefit of the public, which might be availed of, with the consent of the public authorities, properly expressed, by other railroad companies which might

wish to use not only the right of way through the park, but also that between the park and the Union Depot.

The two agreements and the deed constituted a single transaction, and should be construed together, and liberally in favor of the public.

Such easement covered the tracks through the park and the tracks east of the park to the Union Depot.

The Circuit Court had power to enforce the specific performance of the agreement by enjoining the appellants from preventing the Colorado company from using the right of way; and to fix the amount of compensation by its use.

A remedy at law would be wholly inadequate.

The rights of the public in respect to railroads should be fostered by the courts.

The object of protecting the park, and that of preserving and fostering the commerce of the city, were set forth in the tripartite agreement, and the city of St. Louis, a plaintiff in the suit, as charged with those duties, was not merely a nominal party to this suit.

THIS was an appeal by James F. Joy, Thomas H. Hubbard, Edgar T. Welles, and O. D. Ashley, as purchasing committee, the Central Trust Company of New York and James Cheney, as trustees, and the Wabash, St. Louis and Pacific Railway Company, a Missouri corporation, (hereinafter called the Wabash company,) from a decree of the Circuit Court of the United States for the Eastern District of Missouri, made December 31, 1886, on a bill of intervention filed July 12, 1886, in the same court, by the City of St. Louis, a municipal corporation of the State of Missouri, and the St. Louis, Kansas City and Colorado Railroad Company, a Kansas corporation, (hereinafter called the Colorado company,) against the Wabash company and its receivers. This bill of intervention was filed in two causes pending in the same court consolidated into one. One of them was a bill in equity filed by the Wabash company against the Central Trust Company of New York and others, on the 27th of May, 1884, for the appointment of receivers of the Wabash company, because of its insolvency, setting forth that it had executed two mortgages, one known as the "general mortgage," and the other as the "collateral trust mortgage," the first of them June 1, 1880, to the Central Trust Company of New York and James Cheney, as trustees, and the other of them May 1, 1883, to the Mercantile Trust

Company of New York. In the said suit, a cross-bill was filed in the same court, on June 9, 1884, by the Central Trust Company of New York and James Cheney, as trustees, to foreclose the said "general mortgage" and certain sustaining mortgages executed in aid of it. An amended bill was filed June 15, 1884, and an amended cross-bill October 14, 1884. The second suit was one brought January 13, 1885, by the Central Trust Company of New York and James Cheney, as trustees, in the Circuit Court of the city of St. Louis in Missouri, against the Wabash company and others, praying the same relief prayed for in such cross-bill filed June 9, 1884. This suit was removed into the Circuit Court of the United States for the Eastern District of Missouri, and was consolidated, on March 19, 1885, with the suit, the bill in which was filed May 27, 1884.

A decree of foreclosure and sale was made in the consolidated cause on January 6, 1886, under which, on April 26, 1886, the railroads and property were sold to Joy, Hubbard, Welles, and Ashley, as purchasers. The sale was confirmed June 15, 1886; and deeds were ordered to be executed to the purchasers. Meantime, and before the deeds were executed, the bill of intervention was filed. The railroad property in question was all the time in the hands of Solon Humphreys and Thomas E. Tutt, as receivers appointed by the court on May 27, 1884.

The facts involved in the present appeal depend almost entirely upon documentary evidence, and as agreed upon by the parties in their respective briefs may be stated as follows:

This action was brought to compel the specific performance of a contract through which the Colorado company claimed to be entitled to a joint use, with the Wabash company, of that portion of the tracks of the latter company which extends eastwardly from a point on the northern line of Forest Park, through the park, and from thence to the Union Depot in the city of St. Louis, at Eighteenth Street. The facts out of which the controversy arose were, substantially, as follows:

(1) In August, 1871, a railway corporation known as the St. Louis County Railroad Company (hereinafter called the County

company) was organized under the general laws of Missouri, to construct a narrow gauge railroad, from the city of St. Louis, in a westerly direction, to a point in the county of St. Louis 16 miles from the city.

(2) On November 3, 1871, W. D. Griswold was the owner of a tract of land lying immediately west of the city of St. Louis, known as the Cabanne Dairy Farm, and on that date he sold and conveyed to the County company a right of way forty feet in width, through the tract owned by him.

(3) On March 25, 1874, the legislature of Missouri passed an act for the establishment of Forest Park, in the county of St. Louis, immediately west of the city. The act described the property which might be taken by condemnation for park purposes, and included the farm or tract owned by Griswold. The third section of the act contained the following proviso : "*Provided,* That nothing in this act contained shall prevent the St. Louis County Railroad Company from using and occupying a right of way of the width of not more than seventy feet through the northeastern portion of said Forest Park ; the said railroad shall only enter the park through Duncan's subdivision on the east side of said park, and running westwardly on the northern side of the river des Peres, shall pass out of said park at a point on the northern line thereof, east of Union Avenue : *And provided further,* That no switch or siding shall be constructed by said railroad company in said park, nor shall more than one depot be established in said park, and that shall be for passengers only : *And provided further,* That the grade of said railroad, as far as the same runs through said Forest Park, shall be approved by said park commissioners." (Laws of Missouri, 1874, p. 371.)

(4) On August 11, 1875, the County company having located its line between the city and the park, and having acquired some detached portions of a right of way through a number of lots and blocks between the Union Depot and the park, and the St. Louis, Kansas City and Northern Railway Company (hereinafter called the Kansas City company) already having a line of railroad from St. Louis to Kansas City, which connected on the northern line of the park with the right of

way and line of the County company, those two companies entered into a written contract, in which the County company agreed to convey to the Kansas City company, for the sum of $125,000, a strip twenty-eight feet wide through each tract owned by it, between the eastern line of the park and the western limits of the city; and a strip thirty feet in width through each tract lying between the western limits of the city and the Union Depot at Eighteenth Street; and also an undivided one-half of all the right of way it then owned or might thereafter acquire through the park. The contract also provided, among other things, that inasmuch as the Kansas City company was to make a tunnel and cut just east of the park, it should let the trains of the County company pass through said tunnel and cut under such regulations and restrictions as were agreed upon with respect to trains in the park and elsewhere. It was then provided, that the use of the property in the park and through the tunnel and cut should be in common, but that the Kansas City company should have absolute control of the running and starting of its own trains and the making of its own time-tables, and that no train of the County company, or its assigns, should be started within eight minutes of the time fixed for starting the trains of the Kansas City company; that there should be twenty minutes' time between the starting and coming in of the trains of the County company; that only the County company should have a depot in the park; and that the Kansas City company should not have a depot or stop its trains in the park. The contract also provided, that at two specified places within the city limits where the right of way of the County company was narrowest, it (the County company) might lay and use one rail on the right of way of the Kansas City company; that where proceedings for condemnation, or negotiations, had been commenced by the County company the same should be prosecuted, or discontinued, as requested by the president of the Kansas City company; that, in consideration of the covenants therein contained, and of certain covenants and agreements on the part of the Commissioners of Forest Park contained in another agreement of even date therewith, the Kansas City company

should construct and maintain its railroad through the park, tunnel and cut, for the joint use of both of said railroad companies; and that the County company would within two years pay to the Kansas City company one-half of the actual cost of constructing said road through said park, and said tunnel and cut, or forever relinquish to the Kansas City company all claims to the road and property in said park, tunnel and cut. This contract was signed by said parties and delivered, but it was never acknowledged or recorded in the office of the county recorder.

(5) On the same day the foregoing contract was made, the County company, in pursuance of its agreement, conveyed to the Kansas City company a strip twenty-eight feet in width through each lot or tract owned by it between the eastern line of the park and the western limits of the city; a strip thirty feet wide through each lot or tract owned by it between the western limits of the city and Tayon Avenue in the city of St. Louis; and an undivided one-half of all its right, title and interest in or to the right of way and other privileges and franchises then owned or held by it, or which might thereafter be owned or held by it, through said park. The portions of the foregoing deed which were material to this controversy were as follows: "And also the said party of the first part" [the County company] "hath conveyed, assigned, and transferred, and by these presents doth convey, assign, and transfer unto the said party of the second part" [the Kansas City company] "the right of way over and upon the following described piece of land, situated between King's Highway and Union Avenue, a strip of land twenty-eight (28) feet in width off the southern portion, and for the whole length thereof, of that part of the right of way granted to said party of the first part by W. D. Griswold by deed dated November 3, 1871, and recorded in the office of the recorder of St. Louis County, aforesaid, in book 443, page 96, lying between the northern line of Forest Park and the eastern line of Union Avenue, all of which right of way conveyed by said deed is described as follows, to wit: A strip of land forty (40) feet in width, the centre line of which begins at King's

Highway, twenty (20) feet north of the southeast corner of the land of said Griswold, known as the Cabanne Dairy Farm, and running thence westerly along parallel to the south line thereof eight hundred and twenty-five (825) feet; thence by a curve eleven hundred and seventy (1170) feet long, bearing northwest with a radius of nineteen hundred and three (1903) feet; thence by a line bearing north 55° west, about ten hundred and ninety (1090) feet to a point on Union Avenue, not less than four hundred and eighty-seven (487) feet south of the northeast corner of Robert Forsyth's land. . . . And also the said party of the first part hath conveyed, assigned and transferred, and by these presents doth convey, assign and transfer unto the said party of the second part and to its successors and assigns, an undivided one-half of all the right, title or interest of the party of the first part of, in or to the right of way, and of, in or to any and all other rights, privileges and franchises, powers and immunities, owned by or vested in, or enjoyed by, or that may hereafter be acquired and owned by, vested in or enjoyed by, the party of the first part, in, through or upon Forest Park by any means or from any source whatever; all of which conveyances of the said rights of way in this deed mentioned are made subject to the terms and conditions upon which the same were granted to the party of the first part." The foregoing deed contained the ordinary covenants of warranty, and was duly acknowledged and recorded in the office of the recorder of said county, August 13, 1875. The several pieces of right of way owned by the County company and conveyed by it to the Kansas City company are indicated in blue on Chart A, in the printed record.

(6) On the same day (August 11, 1875) another agreement was entered into, known as the " tripartite agreement," the parties to it being the Commissioners of Forest Park, party of the first part, the County company, party of the second part, and the Kansas City company, party of the third part. This tripartite agreement began by reciting: " That said Forest Park Commissioners, in consideration of the relinquishments, agreements and stipulations hereinafter contained, on the part of the said party of the second part, do hereby accept and ap-

prove the line and grade of said railroad as laid down and described upon the accompanying plat and profile hereto attached and forming part of this agreement, and said line and grade, in case there is no forfeiture of this agreement, is hereby fixed as the sole and finally established right of way to which said party of the second part is entitled by statute or otherwise through said park, or any part thereof, and the width of said right of way, as established by statute, is hereby reduced from seventy (70) feet and fixed at forty-two (42) feet between its outer points." The County company then relinquished twenty-eight feet off the seventy feet of its right of way established by statute through the park, leaving its right of way through the park forty-two feet in width. The agreement then, in eight successive paragraphs, provided for the manner of constructing the road-bed through the park by the County company — that it should not be so constructed as to mar the landscape beauty of the park; and for the building of a depot in the park just outside of the right of way, but immediately adjoining it. The eighth and ninth paragraphs read as follows: "Eighth. The work of constructing said railroad through said park shall be commenced in good faith by the party, as hereinafter specified, within ninety (90) days from the delivery hereof, and shall be completed in one year thereafter under penalty of a forfeiture of this agreement, and upon completion thereof the railroads shall be operated through said park so as to prevent unnecessary noise or inconvenience to the public, as far as reasonably practicable, and the roads or their assigns shall comply with all reasonable rules or regulations of said Park Commissioners in that respect, and all of the aforesaid permanent improvements shall be kept and maintained in such condition as will not injuriously affect or mar the landscape beauty of the park, this provision referring to the aforesaid forty-two (42) feet right of way road-bed ; and said party of the second part, or its assigns, shall also keep its police or guard, within the limits of the park, neatly uniformed. Ninth. Said party of the second part shall permit, under such reasonable regulations and terms as may be agreed upon, other railroads to use

its right of way through the park and up to the terminus of its road in the city of St. Louis, upon such terms and for such fair and equitable compensation to be paid to it therefor as may be agreed upon by such companies." The tenth paragraph was an admission by the County company that its right of way was not exclusive, and that the agreement was not to be construed as limiting or impairing the right of the Park Commissioners to grant other rights of way to other railroad companies. The twelfth paragraph was as follows: "And whereas, for the purpose of enabling the party of the third part to reach the Union Depot of St. Louis, Missouri, an amicable arrangement and agreement for a right of way outside of and through said Forest Park has been made and entered into by and between the parties of the second and third parts, and in pursuance thereof the parties of the second and third parts are to enter upon and enjoy the right of way and all the rights, privileges, immunities, powers, improvements and property belonging to or vested in, or that may belong to or vest in, the party of the second part, in common, in, upon and through said park, under certain regulations, terms and conditions agreed upon by and between said parties therein; and whereas the party of the third part, in further pursuance of said last-named agreement, is about to construct, maintain and operate a railroad in, upon and through said park, at great expense, and to engage in other great outlays and to assume other heavy burthens and responsibilities to be of advantage to said third party through the continued enjoyment of said right of way and other rights, privileges, powers, franchises, immunities, improvements and property in, upon and through said park: Now, therefore, in view of the premises and as inducements to said party of the third part to proceed as intended, the party of the first part does hereby grant and convey unto, and license and permit, the said party of the third part, its successors and assigns, to have, hold, use and enjoy said right of way in, upon and through said park, in common with and to be held and enjoyed jointly with said party of the second part and its assigns, on the terms of the said contract between them, and under the same terms and

conditions as are hereby and hereinbefore imposed upon said party of the second part, and which are hereby assumed by said party of the third part as to improvements, except as to building a depot and switch in said park, which the party of the second part is to do itself; or in case said party of the second part, its successors or assigns, should forfeit its said rights, privileges and franchises in, upon and through said park, or from any cause cease to have, maintain or enjoy the same, then it is hereby agreed and convenanted that the party of the third part shall not also be excluded from said park but shall, with its successors and assigns, continue to have, maintain and enjoy all of said rights, privileges, immunities, franchises, improvements and property, on the terms hereinbefore set forth, continuously and forever." The thirteenth paragraph provided that the Kansas City company should have no depot in the park. The fourteenth paragraph, in so far as it is material, was as follows: " Now, therefore, in consideration thereof and of the agreement of the party of the third part herein, the party of the first part herein accepts the agreement and contract of the party of the third part herein to execute, perform and comply with all of the terms, provisions and things herein mentioned to be done, performed or complied with as to said improvements, except as aforesaid, by the party of the second part hereto, and in lieu and stead of said party of the second part hereto, so far as assumed as aforesaid, releasing it therefrom, and in consideration thereof the party of the third part hereto covenants and agrees with the other parties hereto that it will, in lieu and stead of the party of the second part hereto, do, perform and comply with all the terms and provisions, matters and things, herein expressed to be done, performed or complied with by said party of the second part as to said improvements, except as aforesaid, subject to the terms and conditions in said agreement of even date herewith contained ; and it is hereby expressly covenanted and agreed that a compliance by the party of the third part, for itself, or for itself and the party of the second part jointly, in the construction of said railroad in, upon and through said park, tunnel and cut in accordance with the

terms of this agreement, shall be taken and accepted as performance of the conditions imposed upon said party of the second part; and it is further expressly covenanted and agreed that all and every part of the work, its kind, description and extent, to be performed by either of said parties of the second or third parts is hereinabove expressed, and neither of said parties shall be held or required to do or perform any other or further work and conditions than those hereby definitely set forth." The last clause of the contract provided that neither of said railroad companies should be required to supply any material, or do any of the work, necessary to construct or maintain either of the arched entrances into or exits from said park, but that all the work and material required in the construction of said arches should be paid for by the Park Commissioners. The foregoing contract was signed by the parties, but it was never acknowledged as a deed. It was afterwards, in 1879, recorded in the office of the county recorder.

(7) The evidence showed that, after the execution of the foregoing deed and contracts, the Kansas City company acquired from divers parties the necessary additional right of way between the park and the Union Depot, and proceeded to construct and put in operation its road through the park, tunnel and cut, and on down to the Union Depot in the city, the road through the park being on the line established by the tripartite agreement; that at the same time the Park Commissioners proceeded with the work referred to in the last clause of that agreement, and expended for material and work on the arched entrances or exits, rendered necessary by the presence of the railroad in the park, and in the erection of walls for the tunnel in the park, nearly $40,000; that the road through the park was completed in 1876 by the Kansas City company; and that, the County company having failed in the performance of all its covenants, and having failed to refund to the Kansas City company any portion of the cost of constructing the road through the park, it lost and abandoned all claim to the right of way and road-bed through the park, tunnel and cut, and the Kansas City company thereupon, under the terms of the agreement, took sole control of the

road through the park, tunnel and cut. Afterwards, in 1878, it acquired, by purchase from third parties, all the property and rights of way of the County company between the park and the Union Depot.

(8) In 1879, the Kansas City company was consolidated with the Wabash Railway company under the name of the "Wabash, St. Louis and Pacific Railway Company." The Wabash company assumed all the obligations of the Kansas City company, and in so far as this controversy is concerned the consolidation was only a change of name.

(9) In 1880, the Wabash company conveyed its property in trust to the Central Trust Company of New York and James Cheney, to secure a series of bonds, $18,000,000 of which were issued and sold. In 1884, the Wabash company became insolvent, and Solon Humphreys and Thomas E. Tutt were, by the Circuit Court of the United States for the Eastern District of Missouri, appointed receivers of its property, and afterwards bills were filed by the Central Trust Company and Cheney to foreclose said mortgage, as before mentioned.

(10) In 1886, while Humphreys and Tutt, receivers, were in possession of the Wabash property, the Colorado company having constructed a line of railroad connecting with the Wabash road at the north line of Forest Park, and of the same gauge, demanded of the receivers permission to run its cars over the Wabash tracks through the park and down to the Union Depot in the city, which Union Depot was, on August 11, 1875, and has since continued to be, the only general passenger depot reached by all railroads entering the city. The Colorado company contended that it was entitled to this right under the contracts aforesaid, and particularly under the provisions of the ninth and the subsequent paragraphs of the tripartite agreement. This claim was denied by the receivers, and thereupon the Colorado company and the city of St. Louis filed their said bill of intervention, setting forth the facts above stated, and praying the court to enjoin and restrain the Wabash company and the receivers from interfering with its use of said property. The city of St. Louis joined in the proceeding as the successor of the Park Com-

missioners, the park having, by appropriate legislation, been brought within the jurisdiction of the city. An amended bill of intervention was filed August 4, 1886. The prayer of the amended bill was as follows: "Your orators pray that a writ of injunction issue out of and under the seal of this honorable court enjoining and restraining the said Wabash, St. Louis and Pacific Railway Company, and the said Solon Humphreys and Thomas E. Tutt, as such receivers, and each of them and of their agents, servants, counsellors and employés, from in any manner refusing to permit your orator, the St. Louis, Kansas City and Colorado Railroad Company, under such reasonable regulations and terms as to this court may seem proper, from using the said right of way of said Wabash, St. Louis and Pacific Railway Company, commencing at the north line of said park, where the railway of said Wabash, St. Louis and Pacific Railway Company enters said park, thence over said right of way to said Eighteenth Street in said city of St. Louis, by running its engines and cars over and upon said right of way, including the tracks of said Wabash, St. Louis and Pacific Railway Company between the points at said Union Avenue and said Eighteenth Street." In their answer the Wabash company and the receivers admitted the execution of the agreements, but denied that under them, or either of them, the Colorado company had any right to use any portion of the Wabash tracks or right of way through the park or between the park and Eighteenth Street. The answer then stated the facts concerning the execution of the general mortgage by the Wabash company in 1880, to the Central Trust Company and Chenoy; averred that the Wabash company had made default in the payment of interest on its bonds; that by the terms of said mortgage said trustees were entitled to possession of said property; that said receivers were in possession of said railroad under said mortgage for the benefit of the holders of said mortgage bonds, and that neither said bondholders, trustees or receivers were privy to or bound by any agreement or contract made by the County company with said Park Commissioners, with respect to the use of its railroad through said park or elsewhere, by other railroad companies. The answer

then denied that the intervenors were entitled to the relief prayed for, and set up the several defences stated and relied upon by the appellants.

(11) On the issues thus presented the case was referred to a special master, who reported in favor of the claim made by the intervenors. Considerable testimony was taken by the master, but it related almost entirely to matters affecting the compensation to be paid for the use of the tracks and property in question, and it is unnecessary to refer to it in detail. The following testimony of witnesses, on other points, was given: S. T. Emerson, chief engineer in charge of the construction of the Kansas City road from the Union Depot to the north line of the park, testified as follows: " Q. Now from that point [Forsyth Junction] to the Union Depot, what is the most, or the only, practical entrance to the depot from that point? A. The Wabash railroad." W. Emerson also testified as follows: " Q. How many tracks, if any, are on the right of way where the Wabash railway now enters the park from Eighteenth Street, the thirty feet from Eighteenth Street to the park and the forty-two feet through the park? A. There are occasional places where there is a side track. There could not be but one track besides the main track on the thirty feet." Andrew McKinley, president of the Board of Forest Park Commissioners at the time the tripartite agreement was made, testified as follows: " Q. What was the policy of the board with reference to railroads passing through the park, at the time of the execution of the tripartite agreement? A. There was a great deal of discussion and there was quite a controversy about where the road should run, under the provision which I have mentioned," (referring to the act of the legislature, requiring the County road to enter on the eastern side, through Duncan's subdivision). " Q. Please describe the park to the master, whether it has been improved, and, if so, how, in a general way? A. The provisions contained in the proviso that I have just spoken of were intended to protect the park against the invasions of all railroads, unquestionably. I put it there myself. Q. What effect would the invasion of the park by railroads have upon the park for the purpose for

which it was established? A. I think a very damaging effect upon the point of use and upon the point of landscaping. Q. For what purposes was the park intended to be used principally — as a driving park? A. It is shown in the act itself to be dedicated to the people of the city and county of St. Louis for their enjoyment forever — that is, a pleasure ground for the people of St. Louis. Q. Are there drives running through it? A. Yes, sir; nineteen and three-quarters miles of drives through the park. Q. What effect would the penetration of the park by railroads at different points have upon the park as a driving park? A. Up to this time it was apprehended that the road would produce some great danger to persons visiting Forest Park, and it was a long time before that public impression was relieved of the apprehension that horses would be frightened, and hence there is a provision that the road shall be covered over with a cover or protected by trees. During the time I was president of the park it was not thought to be necessary. Q. How much money has been expended in beautifying the park? A. $405,000 during my administration; since that time nothing. It remains as it was then. Q. What does it represent in money to-day? A. In cash paid $1,300,000, and, besides that, some contributions made by the city since. The interest on that sum, of course, is to be added. The bonds are thirty-year bonds." Cross-examination: "Q. Now, the expenditures by the Park Commissioners were in the erection of masonry composing these two arches and the principal viaduct through which the people enter the park. It was in the masonry composing those structures? A. Yes, sir; there would have been no necessity for them, except for the railroad. Q. They were made necessary by the railroad? A. Yes, sir. Q. They were for the convenience of persons passing in and out of the park? A. Yes, sir. Q. Without the railroad there would have been no necessity for the culverts; they were the entrances for carriage and footmen? A. Yes, sir." A. A. Talmage, general manager of the Wabash company, testified as follows: "Q. Would it be practicable for any other road subject to your rules and regulations to use the track from the north line of the park to the

depot — I mean the main track? A. It could be done under the rules and regulations of this company, but usually it is done by substituting the motive power and trainmen of our own road to handle the trains of foreign roads."

(12) The Wabash company and the receivers excepted to the reports of the master (of which there were two) on various grounds, which need not be given in detail.

(13) The exceptions were argued before the court held by Mr. Justice Brewer, then Circuit Judge, and Judge Treat, and it held, (29 Fed. Rep. 546,) that, under the contracts, the Colorado company had the right to use, on such terms and subject to such regulations as to the court seemed equitable, the Wabash tracks through the park, and from the park down to the connection with the Union Depot tracks at Eighteenth Street in the city ; and on those points it overruled all the exceptions and confirmed the master's reports. It differed, however, with the master on the question of the compensation to be paid by the Colorado company, and sustained exception eleven on that point.

(14) The court then entered a decree, December 31, 1886, finding that the equities were with the intervenors, and that they were entitled to the relief prayed for, and fixing the compensation to be paid by the Colorado Company for the use of the right of way and tracks, side-tracks, switches, turn-outs, turn-tables and other terminal facilities of the Wabash company, between the north line of Forest Park and Eighteenth Street in the city of St. Louis, at $2500 per month. The decree then proceeded as follows: "And the court doth further find, adjudge and decree, that the expense per annum of maintaining the said right of way and other property pending such joint use thereof, including therein all taxes upon said property, shall be borne by the said Wabash, St. Louis and Pacific Railway Company and the said intervenor, the St. Louis, Kansas City and Colorado Railroad Company, in the proportion that the number of wheels each of said companies shall cause to be passed over the main track, or parts thereof, on said right of way, per annum, bears to the total number of wheels that both of said companies shall cause to be passed

over the same during each year pending the said period of such joint use, and that this expense shall be paid at the expiration of each year. The said right of way and tracks thereon and other terminal facilities shall be maintained and kept in good repair by the Wabash, St. Louis and Pacific Railway Company. And the court doth further order, adjudge and decree that the running of all trains, engines or cars of said intervenor, the said St. Louis, Kansas City and Colorado Railroad Company, over said right of way and tracks, and the use of said right of way, road, terminal facilities and other property specified as aforesaid, shall conform to the rules and regulations now in force, and such other reasonable rules and regulations as may hereafter be adopted by the said Wabash, St. Louis and Pacific Railway Company, or its said receivers, to enable said intervenor to fully enjoy the benefits of this decree, and that the trains of said railroad company, intervenor, shall be so regulated as that at least eight minutes shall, if deemed necessary, intervene between its trains and the trains of said Wabash, St. Louis and Pacific Railway Company, at any point between said north line of Forest Park and Eighteenth Street, and that the sole control and regulation of the running of the trains of the said companies shall be, under this decree, in the Wabash, St. Louis and Pacific Railway Company and its receivers, and subject to the further order of this court. And the court doth further order, adjudge and decree, that in all respects, subject to the terms of this decree, the said railroad company, intervenor, shall enjoy the equal use and benefit of said right of way, tracks, switches, side-tracks, turn-outs, turn-tables and other terminal facilities with said Wabash, St. Louis and Pacific Railway Company or its said receivers, and the said Wabash, St. Louis and Pacific Railway Company and Solon Humphreys and Thomas E. Tutt, as such receivers, and said Central Trust Company of New York and James Cheney, and all persons claiming by, through or under them and each of them respectively, and their agents, servants, counsellors and employés be, and the same are hereby, perpetually enjoined and restrained from in any manner refusing to permit the said intervenor, the said St. Louis, Kansas City

and Colorado Railroad Company, its successors or assigns, and its or their officers, agents or employés, from using with its or their engines, cars (loaded or empty), the said right of way, tracks, switches, side-tracks, turn-outs, turn-tables and other terminal facilities of said Wabash, St. Louis and Pacific Railway Company between the north line of said Forest Park and said Eighteenth Street, on the terms hereinabove set forth in this decree, in and for the transacting of its or their business, and in the operation of its or their road. And the said intervenor, the St. Louis, Kansas City and Colorado Railroad Company, by its officers, agents and employés and each of them, is hereby authorized and permitted, with its right of way, road, tracks and property, engines and cars, loaded or empty, to make connection with said Wabash, St. Louis and Pacific Railway Company at the north line of said Forest Park, and to use the said right of way, tracks, switches, side-tracks, turn-outs, turn-tables and other terminal facilities of said Wabash, St. Louis and Pacific Railway Company, or any one claiming by, through or under it, as to the same, between the north line of said park and Eighteenth Street, on the terms, in the manner, and subject to the regulations in this decree set forth in and for the transaction of the business, and in operation of the road, of said St. Louis, Kansas City and Colorado Railroad Company, its successors or assigns, and said Solon Humphreys and Thomas E. Tutt, receivers, and all agents, servants or persons by them engaged or acting with or for them, said Central Trust Company and James Cheney, said Wabash, St. Louis and Pacific Railway Company, and all persons claiming by, through or under said last-named company, are hereby restrained and enjoined from in anywise obstructing, preventing, interfering with or refusing to comply with, the permit and privilege hereby ordered, adjudged and decreed." The rules in force upon the Wabash road, and which were adopted by the decree, for the government of the parties in the use of the property, are found, as "Exhibit D," in the printed record.

(16) On the day the decree was entered, James F. Joy, Thomas H. Hubbard, Edgar T. Welles and O. D. Ashley filed their petition in the cause, reciting the execution of the

Wabash mortgage of June 1, 1880, to the Central Trust Company and Cheney, as trustees; stating that there had been a foreclosure of said mortgage and a sale of the mortgaged property on the 26th day of April, 1886, at which they had become the purchasers; that the sale to them had been duly confirmed by the court and proper deeds had been made conveying to them the right of way, railroad tracks, terminal facilities and other property, the use of which the intervenor was seeking to acquire in this proceeding; that said property was still in the possession of and being operated by said receivers; that, as such purchasers, they had an interest in the property and subject matter of the litigation, which they desired to protect by an appeal to the Supreme Court of the United States; and asking that they be made parties defendant, and be allowed an appeal to that court. The court thereupon entered an order, on said day, reciting the petition, and that it appeared to the court that said Joy, Hubbard, Welles and Ashley were the owners of the premises and right of way theretofore owned by the Wabash company, between the north line of Forest Park and across the park to Eighteenth Street in the city of St. Louis, over which the intervenor was seeking to obtain a right to run its engines and cars, and ordering that said purchasers be made parties defendant in the cause. An appeal to this court from the foregoing decree was afterwards duly perfected.

*Mr. Wells H. Blodgett* for appellants.

I. The court erred in holding that the covenants on the part of the County Railroad company to permit other railroads to use its right of way between the park and the terminus of its line in the city, was binding on the Kansas City company, and gave respondent the right to use the right of way and tracks afterwards acquired and constructed by the Kansas City company between the park and the city.

Our contention is, that the provision at the end of the twelfth paragraph of the tripartite agreement to the effect that " if the County company should forfeit its rights, privi-

leges and franchises upon and through the park, such forfeit-
ure should not affect the rights of the Kansas City company,
but that the Kansas City company should continue to have,
maintain and enjoy all of said rights, privileges, immunities,
franchises, improvements and property on the terms therein-
before set forth, continuously and forever," — only relates to
the right of way through the park, and that it has no refer-
ence to anything between the park and the city.

It is obvious that the other two parties to the agreement
intended, by the last clause of the twelfth paragraph, to say
to the Kansas City company, as an inducement for it to
proceed with the work of constructing the line through the
park, that in case it did make the expenditures contem-
plated, it should not afterwards be excluded from the park in
consequence of any future forfeiture or failure on the part of
the County company to fulfil its covenants. The idea was
that if the Kansas City company constructed the line through
the park, it was to continue in the park on the same terms
imposed upon the County company. Therefore, no matter
what view the court may take of the decree with respect to
other matters, it was erroneous for the court to extend the
decree over any portion of the track of the Kansas City com-
pany lying outside the park.

II. The court erred in holding and decreeing that the cove-
nant of the County company — to the effect that "it would
permit other railroads to use its right of way between the
park and the terminus of its road in the city" — created an
equitable easement in the road between the park and the city
which affected that property in the hands of Joy and others,
as purchasers from the Kansas City company.

An equitable easement is said to be a right without profit,
which the owner of one tract of land has, to restrict or regu-
late, for the benefit of his own tract, the uses to be made of
another contiguous tract. There must, of course, be two
estates, a dominant and a servient estate, and in order to
create an equitable easement, or an easement which only a
court of equity can enforce, the burden or duty imposed on
the servient estate, must be for the benefit of the dominant

estate. The covenants must "touch or concern" or "extend to the support of the dominant estate." They must be "for the benefit of the dominant estate." *Whitney* v. *Union Railway Co.*, 11 Gray, 359; *Jenks* v. *Williams*, 115 Mass. 217; *Jeffries* v. *Jeffries*, 117 Mass. 184; *Norcross* v. *James*, 140 Mass. 188.

These cases hold that when a party conveys a portion of his lands, and the grantor accepts a covenant back from his grantee, to the effect that neither he nor his assigns will use the land granted for a purpose prejudicial to the property retained, such covenants, although they cannot be strictly said to run with the land, nevertheless create in the grantor and his assigns equitable easements in the lands conveyed for the benefit of the lands not conveyed, and courts of equity have, therefore, enjoined the covenantor from violating the covenant to the prejudice of the covenantee and his assigns.

In the foregoing cases, as well as in all that are cited and relied upon by the appellees, it will be found upon examination that the covenants which were enforced were contained in deeds of grant, and that they concerned the use of property granted, in its relation to the property retained. The personal covenants of the grantees were, in those cases, regarded as creating easements in the lands granted which would be enforced in equity, although at law they were not covenants which run with the land.

Now, we concede that there are circumstances under which the covenant in question might be enforced if the bill had been filed against the County company (covenantor) and had only related to the right of way in the park. If the bill had only related to the right of way in the park, and it could be truthfully said that the County company acquired its right of way through the park under a grant from the Park Commissioners, and the court could furthermore see that to enforce the covenant would be beneficial to the park, then we think the case would come under the rule announced in the cases above cited.

But when it comes to the right of way outside the park our contention is, that the doctrine of equitable easement has no application, and that as to the property outside the park the

covenant of the County company, with respect to its use by other companies, was merely personal. *Des Moines & Fort Dodge Railroad* v. *Wabash, St. Louis &c. Railway,* 135 U. S. 576; *Norcross* v. *James,* 140 Mass. 188; *Keppell* v. *Bailey,* 2 Myl. & K. 517.

If covenants do not run with land, it is only when they are restrictive and relate to the lands granted that they will be enforced even in equity against assignees with notice. It is said in many cases, and the rule seems now firmly established, that courts of equity will not enforce against the grantee of the covenantor, who has himself entered into no covenant, any covenant of his grantor, which does not run with the land and which requires the expenditure of money. *Haywood* v. *Brunswick Building Society,* 8 Q. B. D. 403; *London & Southwestern Railway* v. *Gomm,* 20 Ch. D. 562. Therefore, in so far as the decree gives to the Colorado company the use of the right of way outside the park, it should be reversed.

III. The court erred in holding and decreeing that a covenant on the part of the County company "to permit other railroads to use its right of way under such reasonable regulations and upon such terms and for such fair and equitable compensation to be paid therefor as might be agreed upon by such companies," constituted an agreement sufficiently definite to be specifically enforced in a court of equity.

A party who merely agrees to permit another at some future time to enter upon and use a given piece of property on such terms and for such compensation, as may, when the time arrives, be agreed upon, does not part with any interest in his estate or impair his dominion over it. The mere right in one party to use the property of another on such terms as may be agreed upon, gives the covenantee no interest in the property. One gets nothing by such a contract. He had the same privilege before the contract was made.

In this case, the regulations, compensation and terms on which the property was to be used, were all left by the contract to the future determination of the parties, and the question is, as to whether a court of equity ought to put itself in the place of the parties and supply not merely some subordi-

nate missing term, but make, in fact, the whole agreement. Or in other words, can a court of equity, under the guise of enforcing a contract, make the contract which it enforces, and in so doing, fix the terms on which one party may use the property of another, when the very contract in question leaves the matter of fixing the terms to the parties themselves? Can a court of equity do that? See *Colson* v. *Thompson*, 2 Wheat. 336; *Hennessy* v. *Woolworth*, 128 U. S. 438; *McKibbin* v. *Brown*, 1 McCarter (14 N. J. Eq.) .13; *Nichols* v. *Williams*, 7 C. E. Green (22 N. J. Eq.) 63; *Whitlock* v. *Duffield*, 1 Hoff. Ch. 110; *Huff* v. *Shepard*, 58 Missouri, 242; *Morgan* v. *Milman*, 3 De G. M. &. G. 24; *Cooth* v. *Jackson*, 6 Ves. 12, 33; *Milnes* v. *Gery*, 14 Ves. 400; *Kemble* v. *Kean*, 6 Sim. 333; *Taylor* v. *Portington*, 7 De G. M. & G. 328; *Wilson* v. *Northampton & Banbury Junction Railway*, L. R. 9 Ch. 279; *Brace* v. *Wehnert*, 25 Beav. 348; *Wilks* v. *Davis*, 3 Meriv. 507; *Blundell* v. *Brettargh*, 17 Ves. 231; *South Wales Railway* v. *Wythes*, 5 De G. M. & G. 880.

The fact must be kept in mind that Joy and his associates took the property as purchasers; that they have made no covenants; that they are assignees of the Kansas City company, and that courts of equity require contracts (where they are such as can be enforced against assignees) to be much more definite and certain in their terms when their enforcement is sought against assignees, than when the proceedings are against original parties. *Kendall* v. *Almy*, 2 Sumner 278; *Montgomery* v. *Norris*, 1 How. (Miss.) 499.

IV. The court erred in entering a decree compelling the specific performance, by the Wabash company, of a continuous duty requiring the exercise of skill and personal judgment, as well as the constant expenditure of money, and requiring the court to retain perpetual control over the cause in order to superintend the execution of the decree, and make, from time to time, such changes in the rules and regulations adopted as the circumstances of the parties and the shifting contingencies of business and trade should render necessary.

The question of whether a court of equity will specifically enforce a contract which requires the performance of continu-

ous duties, and the constant supervision, by the court, of a business involving skill, personal labor, cultivated judgment and the constant expenditure of money, and where, if performance is decreed, the case must remain indefinitely in court, has been so recently and so fully considered here, that to determine this case it seems only necessary to examine the decree and see whether it falls within the rule announced.

Under this decree the case must remain forever in court, and the court to the end of time may be called upon to determine the innumerable controversies that may arise between the parties under its provisions. Under it, constant payments and settlements are to be made, some monthly, others annually, and hence it is a constant and perpetual duty of the court to enforce those provisions. Under the decree it is made the duty of the Wabash company to perpetually maintain the tracks and all said terminal facilities in good repair, and the question of what is good repair is an issue on which the parties are entitled to be heard, and may call for as many separate trials as there are complaints.

And furthermore, to keep the property in good repair, calls for the constant expenditure of money and the exercise of judgment and professional skill, and to perform that duty the court must, if required, compel the Wabash company, or its assigns, to raise money and afterwards expend it with the judgment and skill necessary to keep the tracks, turn-tables and other terminals in good repair. A failure to comply with any one of the ninety-eight rules, or a dispute as to their meaning, furnishes a controversy that can only be determined by the court that entered the decree. Not only that, but new rules may be made and the question of whether they are reasonable, is reserved to the court, and, on application of the parties, must be determined by it. In short, the whole future management of the property is, by the decree, taken out of the hands of its owners and, for all time, subjected to the orders and control of the court,

In Texas and Pacific Railway Co. v. Marshall, 136 U. S. 393, it was recently held that it was error for a court of equity to enter a decree which required it to be making constant

inquiries as to whether its provisions were being obeyed perfectly and in good faith, or in an evasive manner, and which rendered the court liable to be perpetually called upon to make the same inquiries in the future and thus assume endless duties which are inappropriate to the functions of a court of equity. And it was said that the task of supervising and enforcing a contract for the building of a house or a railroad, was outside the proper functions of a court of equity and not within the powers of a specific performance. See also *Marble Company* v. *Ripley*, 10 Wall. 339; *Port Clinton Railroad* v. *Cleveland & Toledo Railroad*, 13 Ohio St. 544; *South Wales Railway Co.* v. *Wythes*, 5 De G. M. & G. 880; *Powel Duffryn Steam Coal Co.* v. *Tuff Vale Railway Co.*, L. R. 9 Ch. 331; *Ross* v. *Union Pacific Railway*, 1 Woolworth, 26; *City of St. Thomas* v. *Credit Valley Railway*, 7 Ontario, 332; *Blanchard* v. *Detroit &c. Railroad*, 31 Michigan, 43; *Pollard* v. *Clayton*, 1 Kay & Johns. 462; *Booth* v. *Pollard*, 4 Younge & Coll. Ex. 61.

V. The court erred in entering a decree broader than the contract.

The contract only related to right of way; the prayer of the petition was for the use of right of way and tracks, and the decree not only gives them the use of the right of way and tracks, but it subjects to the use of respondent the switches, side-tracks, turn-outs, turn-tables and other terminal facilities, and even goes so far as to require the Wabash company to keep those additional properties in repair for respondent's use. Therefore, no matter what view may be taken of the case in other respects, the decree was erroneous in two particulars: First, because it is broader than the covenant; and second, because it is broader than the prayer of the bill. Both these objections are elementary.

VI. The court erred in holding that mutuality of equitable remedy existed between the parties to this suit.

The question of whether there is mutuality of equitable remedy between appellants and the Colorado company, is a matter that can only be determined by reference to the nature of the contract, the words employed and the relation of the

parties to each other. Of course these parties have no contract relations. The Colorado company has no contract relations with any one, and it is not pretended that Joy and his associates have entered into any covenants. The agreement on the part of the County company was, that it would, at some future time, make contracts permitting other railroads to use its right of way on such terms as might be agreed upon between it and the companies desiring to enter upon the use of its right of way.

The contract that was made between the Park Commissioners and the railroad companies, and under which certain work was done in the park, was one thing, and the contract to be made between the company owning the railroad and the company desiring to use it, was quite another.

By its decree, the court has clearly attempted to enforce the contract to be made, or in other words, it has put into its decree such provisions as, in its opinion, the parties ought to have put into an agreement of their own making.

VII. The court erred in holding that the contract of the County company to permit other railroads to use its right of way, was binding on Joy and his associates, they being purchasers in good faith and without notice, under the mortgage made by the Wabash company in 1880.

If the tripartite agreement was never acknowledged as a deed, then the filing of it in the office of the Recorder, imported no notice to Joy and his associates. That point was expressly ruled in. *Bishop* v. *Schneider*, 46 Missouri, 472. But to avoid the effect of the rule laid down in that case, the court found that the recitation in the deed of August 11th, 1875, from the County company to the Kansas City company (which deed was duly recorded) to the effect "that the County company executed that deed in pursuance of the terms of a certain contract made between the same parties on the 11th day of August, 1875, and in full satisfaction of so much of said contract as related to the conveyance of certain pieces of land and rights of way to said party of the second part," was sufficient to put subsequent purchasers on inquiry as to the contents of the previous unrecorded contract between

the two companies; and that, having found and examined the contract between the two companies, a purchaser would discover in it a reference to the unacknowledged and improperly recorded tripartite agreement, and that upon reading the tripartite agreement he would find the clause on which the Colorado company bases its claim.

Now, we contend that the above finding was erroneous, and we say : (1) that a statement in a general warranty deed to the effect, " that it is made in pursuance of a previous personal contract between the parties and in full satisfaction of so much thereof as relates to the conveyance of the property," is not, and in reason cannot be, sufficient to put a subsequent grantee on inquiry for prior incumbrances ; and (2) that when the document referred to is not a deed, but a mere collateral personal agreement, a reference to it in a deed, in which the grantor convenants that he is seized of an indefeasible estate in fee simple, does not even put a subsequent purchaser on inquiry

But, again, the court found, that the further statement in the deed from the County company to the Kansas City company, to the effect, " that the County company conveyed said rights of way, subject to the terms and conditions upon which the same were granted to the County company," was sufficient to put subsequent purchasers on inquiry as to such conditions. We grant that proposition, but let us inquire what property the County company was conveying to the Kansas City company " subject to the terms and conditions upon which it had been conveyed to the County company."

As to the lots outside the park, there is nothing in all the record tending to show on what conditions one foot of that ground had been conveyed to the County company. And as to the right of way through the park, the County company held that property under its deed from Griswold, as well as under the third section of the Park Act, and there is nothing in either the deed or act, showing, or tending to show, that the County company held its right of way through the park subject to any conditions whatever. The County company claimed nothing in the park through any grant from the Park

Commissioners, and the Park Commissioners never attempted to grant anything to that company. The title to the lands in the park was vested in the people of the county, and the Legislature had absolute control over it for all purposes. *State* v. *St. Louis County Court*, 34 Missouri, 546; *Barnes* v. *Dist. of Columbia*, 91 U. S. 540. As to the property outside the park — that which was acquired from other parties by deed or by condemnation — there was certainly nothing in the deed from the County company to put Joy and his associates on inquiry concerning incumbrances on those portions of the line. The deed of the County company forms no link in the chain of title through which Joy and his associates held by far the major portion of the line between the park and the city, and we understand that purchasers are only bound to take notice of recitals contained in the deeds which form links in their chain of title. They are not bound to inquire into collateral contracts and circumstances. *Acer* v. *Westcott*, 46 N. Y. 384; *Burch* v. *Carter*, 44 Alabama, 115 ; *Attorney General* v. *Backhouse*, 17 Ves. 282; *Mueller* v. *Engeln*, 12 Bush, 441; *Penrose* v. *Griffith*, 4 Binney, 231.

Certainly, the recitals in the contracts or even in the deed from the County company to the Kansas City company, were no sort of notice to purchasers of any incumbrances upon, or easements in, all that portion of the right of way outside the park not conveyed by the County company to the Kansas City company. As to the property not purchased from the County company, the recitals in its deed to the Kansas City company lay outside the chain through which Joy and his associates derive title to all that portion of the property which never belonged to the County company. Therefore, as to all the property not purchased from the County company, the record shows no fact sufficient to put a purchaser on inquiry for incumbrances of any sort. This point was expressly ruled in *Tydings* v. *Pitcher*, 82 Missouri, 379.

*Mr. John C. Orrick* for appellees. *Mr. Leverett Bell* and *Mr. George R. Peck* were with him on the brief.

.MR. JUSTICE BLATCHFORD, after stating the case as above reported, delivered the opinion of the court.

It is contended by the appellants that the Circuit Court erred (1) in holding that the covenant on the part of the County company, to permit other railroads to use its right of way between the park and the terminus of its line in the city, was binding on the Kansas City company, and gave to the Colorado company the right to use the right of way and the tracks afterwards acquired and constructed by the Kansas City company between the park and the city; (2) in decreeing that the covenant of the County company, to permit other railroads to use its right of way between the park and the terminus of its road in the city, created an equitable easement in the road between the park and the city, which affected such property in the hands of Joy and others, as purchasers; (3) in decreeing that such covenant on the part of the County company was an agreement sufficiently definite in terms to be specifically enforced by a court of equity; (4) in decreeing the specific performance by the Wabash company of a continuous duty, requiring the exercise of skill and personal judgment, as well as the expenditure of money, and requiring the court to retain perpetual control over the cause, in order to superintend the execution of the decree and make from time to time such changes in the rules and regulations adopted by the Wabash company as the circumstances of the parties and the shifting contingencies of business and trade should render necessary; (5) in making a decree broader than the contract, in that the County company only agreed, at most, to permit other companies to use its right of way, while the decree gives the right to use the right of way, and tracks, side-tracks, switches, turn-outs, turn-tables and other terminal facilities of the Wabash company; (6) in holding that there was mutuality of equitable remedy between the parties to the suit; and (7) in holding that the contract of the County company was binding on Joy and others, as purchasers in good faith and without notice, under the mortgage made by the Wabash company in 1880.

.But we are of opinion that, under the two agreements of

August 11, 1875, and the deed of that date from the County company to the Kansas City company, the Wabash company, as successor of the latter company, is bound to permit the Colorado company to use the right of way from the north line of Forest Park, through the park, to the terminus of the Wabash company's road on Eighteenth Street, for a fair and equitable compensation.

Forest Park, containing 1379 acres of land, had been established as a park for the benefit of the people, and was intended principally as a driving park. The Board of Forest Park Commissioners had, under the act of March 25, 1874, the power to lay off, improve, adorn, govern, manage and control the use of the park and the avenues surrounding it. Before the execution of the tripartite agreement, neither the County company nor the Kansas City company had any railroad to the Union Depot. The County company had located its line east and west of the park, and had purchased the right of way at different points along its line from the Union Depot to the park; but it had built no railroad, and the location of its right of way through the park was undetermined at the time. The Kansas City company had its depot for freight and passengers in the northern part of the city, some distance from the Union Depot. As the Union Depot was at that time the only general passenger depot in the city, and was reached by most of the railroads which entered the city, the Kansas City company determined to build a branch of its road from Ferguson, about nine or ten miles from the city, to the Union Depot, and thus avail itself of better facilities for doing a passenger business, and to cross the bridge over the Mississippi River with its trains. It is stated in the agreement of August 11, 1875, between the County company and the Kansas City company, that the latter required the right of way in order to reach the Union Depot. Its branch line from Ferguson was located through the park. In its efforts to obtain the right of way through the park it encountered the County company. The Board of Park Commissioners was conferred with by the two companies, in regard to securing a definite right of way for both of them through the park. This is shown by the testi-

mony of Mr. McKinley, before referred to. The Park Commissioners were willing, at that time, to grant the use of one right of way through the park, on a certain line, with conditions as to the use of such right of way by other railroads, so as to protect the park, as far as possible, from invasion by other railroads, on separate and independent rights of way. In order to accomplish this result, the board expended $40,000 in aid of the construction of the railroad through the park. In view of the deep cut on the line of the Wabash road just east of the park, it would be difficult for any other railroad to enter the park, from the east, on an independent right of way, and at the same time use the right of way of the Kansas City company through the park. Hence, arose the provision that this right to use the right of way by other railroads should apply not only to the "right of way through the park," but also to the right of way "up to the terminus of its road in the city of St. Louis," that is, the right of way from the park to the Union Depot.

It was under these circumstances that the tripartite agreement came into existence; and the terms of paragraph 9 of it must be construed. That paragraph is here repeated: "Ninth. Said party of the second part shall permit, under such reasonable regulations and terms as may be agreed upon, other railroads to use its right of way through the park and up to the terminus of its road in the city of St. Louis, upon such terms and for such fair and equitable compensation to be paid to it therefor as may be agreed upon by such companies." It is to be construed in connection with paragraph 12 of the same agreement.

In regard to these two paragraphs, the opinion of the Circuit Court says: "It will be observed that by the ninth paragraph the County road agreed to permit the use of its right of way by other railroads. Whether a like obligation was assumed by the Kansas road depends upon the last sentence in the twelfth paragraph, which purports to grant to the Kansas road the right to occupy and enjoy the right of way through the park jointly with the County road 'on the terms of the said contract between them, and under the same terms and

conditions as are hereby and hereinbefore imposed upon said party of the second part, and which are hereby assumed by said party of the third part as to improvements, except as to building a depot and switch in said park, which the party of the second part is to do itself.' It must be conceded that the meaning of this language is not perfectly clear. It is claimed by the defendants that the words 'as to improvements, except as to building, etc.,' qualify not only the immediately preceding clause, commencing 'and which are hereby assumed,' but also the one prior, commencing 'and under the same terms and conditions,' and therefore that the terms and conditions as to improvements are those alone cast upon the Kansas road. This would make the two clauses but a single compound one, qualified by the following relative clause 'as to improvements,' etc. As against this it must be observed that, grammatically, a relative clause generally qualifies its immediate antecedent, and therefore, in this case, would refer simply to that clause which provides for the assumption by the Kansas road. This natural grammatical construction is strengthened by the punctuation—a comma after the words 'party of the second part' and none after the words 'party of the third part,' which seems to separate the entire first clause from the second and its qualifying terms. I know that the matter of punctuation is never relied upon to defeat the obvious intent; but, when the meaning is doubtful, the punctuation is certainly a matter tending to throw light upon it. Further, there are not simply two, but really three, antecedent clauses, the first one being 'the terms of the said contract between them,' that is, the two railroad companies. Very clearly this qualifying clause does not refer to that, and therefore it should not be held to qualify the second, unless the obvious intent compels such construction. It is objected that the clause commencing 'and which are hereby assumed' is, under this construction, superfluous. I think not. These improvements called for the expenditure of money, and the idea seemed to be that the Kansas road should not only hold its rights upon certain conditions but, that, as to those involving expenditure of money, it should expressly assume the performance. There is a manifest differ-

ence between a conveyance subject to a mortgage and a conveyance in which the grantee assumes the payment of the mortgage. This distinction evidently dictated the form of expression used."

It appears, from paragraph 12, that the Kansas City company had in view the failure of the County company to comply with the provisions of paragraphs 1 to 8 inclusive of the tripartite agreement relating to the construction of the road, among which was the provision which required the completion of the road within one year, under the penalty of the forfeiture of all rights under the agreement. The Kansas City company guarded against such contingency by the provision, in paragraph 12, that, in case the County company, its successors or assigns, should forfeit its rights, privileges and franchises in, upon and through the park, or from any cause should cease to have, maintain or enjoy the same, then the Kansas City company should not also be excluded from the park, but, with its successors and assigns, should continue to have, maintain and enjoy all of said rights, privileges, immunities, franchises, improvements and property, on the terms thereinbefore set forth, continuously and forever. Thereby, in case of the forfeiture of its rights by the County company, the Kansas City company became possessed of the entire right of way, subject to the terms of the agreement of August 11, 1875, between the two companies, and to those of the tripartite agreement of the same date; and that which, prior to the forfeiture, was held and enjoyed jointly by the two companies, became the sole property of the Kansas City company, its successors and assigns, on the terms of the said contract between the two companies, and under the same terms and conditions which were imposed upon the Kansas City company. Among the conditions so imposed were those of paragraph 9 of the tripartite agreement. Further, those terms as to improvements, except as to building a depot and switch in the park, were assumed by the Kansas City company. The depot and switch were to be built by the County company. The word "improvements" related to the building of the road and the erection of what was to be erected, except the depot and switch. The

reason why the Kansas City company did not assume the building of the depot and switch appears from a clause in the agreement of August 11, 1875, between the two companies, to the effect that the County company should have and maintain the passenger depot in the park, so far as the two companies were concerned, and that the Kansas City company should not have the power of stopping any of its trains in the park. As, however, the latter company would use the right of way through the park, and what were called the "improvements," except the depot and switch, the Park Commissioners required it to assume the obligations of the County company in that regard.

This was the view of the contract taken by the Circuit Court, and we think it was correct. It is evidently in accordance with the intention of the parties to the tripartite agreement. The object of the Park Commissioners was to protect the park from the invasion of more than one railroad track; and, to accomplish that result, it was necessary to give to other railroad companies the right to use the one right of way, and to impose on the Kansas City company, as well as the County company, the obligation to permit other companies to use such right of way. *Hayes* v. *Michigan Central Railroad,* 111 U. S. 228.

We are also of opinion that the covenants in paragraph 9 of the tripartite agreement, as to the use of the right of way by other railroad companies, are binding upon subsequent purchasers, with notice, from the Kansas City company. *Tulk* v. *Moxhay,* 2 Phillips, 774; *Luker* v. *Dennis,* 7 Ch. D. 227; *Bronson* v. *Coffin,* 108 Mass. 175; *Whitney* v. *Union Railway Co.,* 11 Gray, 359, 364; *Parker* v. *Nightingale,* 6 Allen, 341, 344; *Vandoren* v. *Robinson,* 16 N. J. Eq. 256; *Kirkpatrick* v. *Peshine,* 24 N. J. Eq. 206; *Western* v. *Macdermott,* L. R. 2 Ch. 72; *Watertown* v. *White,* 4 Paige, 510; *Randall* v. *Latham,* 36 Connecticut, 48, 53; *City of Cincinnati* v. *Lessees of White,* 6 Pet. 431; *Brew* v. *Van Deman,* 6 Heiskell, 433; *Winfield* v. *Henning,* 21 N. J. Eq. 188; *Verplanck* v. *Wright,* 23 Wend. 506; *Stockett* v. *Howard,* 34 Maryland, 121; *Atlantic Dock Co.* v. *Leavitt,* 54 N. Y. 35.

In the present case, the tripartite agreement is a link in the chain of title of the mortgagees and of the purchasing committee. The right of way through the park, granted by Griswold to the County company, November 3, 1871, was lost by non-user. The right of way granted by the Park Commissioners to the County company under the first park act, of March 25, 1872, failed because that act was declared unconstitutional, in *Chouteau* v. *Leffingwell*, 54 Missouri, 458. The third line, that established by the tripartite agreement, was not identical with either of the two prior lines. The Park Commissioners, therefore, granted to the two companies, under the tripartite agreement, all the right of way which they acquired in the park. The right of the mortgagees and of the purchasing committee to use such right of way is based solely upon that agreement; and, holding under it, they must hold subject to its terms and conditions, irrespectively of the question of notice. *Whitney* v. *Union Railway*, 11 Gray, 359; *Vandoren* v. *Robinson*, 16 N. J. Eq. 256; *Tulk* v. *Moxhay*, 2 Phillips, 774; *Luker* v. *Dennis*, 7 Ch. D. 227; *Western* v. *Macdermott*, L. R. 2 Ch. 72. Therefore, the Wabash company, the mortgagees, and the purchasing committee must be held to have had notice of the covenants and conditions of the tripartite agreement prior to the execution of the mortgage, and are bound by them, whether the covenants be or be not strictly such as run with the land.

Nor is the failure to acknowledge the tripartite agreement as a deed of any importance. There was sufficient to put the purchasers on inquiry, and to charge them with notice of all the facts which such an inquiry would have made known. The Wabash company came into existence in August, 1879, through the consolidation of the Kansas City company with the Wabash Railway company. This consolidation took place under statutes by virtue of which the consolidated company took all the property, rights and franchises and assumed all the liabilities of the Kansas City company. The Wabash company, therefore, was not strictly a purchaser from the Kansas City company. The consolidation was merely a change of name. If the Kansas City company was bound by

the tripartite agreement to grant the use of the right of way
to other railroads, on certain terms, the Wabash company, as
consolidated, was equally bound to do so. The mortgage was
executed in 1880, and the committee purchased in 1886. The
tripartite agreement was recorded in the recorder's office of
the city of St. Louis, September 5, 1879, prior to the execution
of the mortgage and prior to the purchase under it made by
the committee. *Bishop* v. *Schneider*, 46 Missouri, 472; *Stevens* v. *Hampton*, 46 Missouri, 404; *Digman* v. *McCollum*, 47
Missouri, 425.

The tripartite agreement, and that between the County
company and the Kansas City company, and the deed from
the County company to the Kansas City company, all of them
bear date August 11, 1875. The deed was duly acknowledged,
and was recorded August 13, 1875. It is a link in the chain
of title of the mortgagees and the purchasing committee. It
recites that it is made in pursuance of the terms of a certain
contract made and executed between the County company and
the Kansas City company, and dated August 11, 1875, and is
in full satisfaction of so much of such contract as relates to
the conveyance of certain pieces of land and right of way to
the Kansas City company. It also contains the following pro-
vision : "And also the said party of the first part hath con-
veyed, assigned and transferred, and by these presents doth
convey, assign and transfer, unto the said party of the
second part, and to its successors and assigns, an undivided
one-half of all the right, title or interest of the party of the
first part of, in or to the right of way, and of, in or to any
and all other rights, privileges and franchises, powers and
immunities owned by, or vested in or enjoyed by, or that
may hereafter be acquired and owned by, vested in or enjoyed
by, the party of the first part, in, through or upon Forest
Park, by any means or from any source whatever; all of
which conveyances of the said rights of way in this deed men-
tioned are made subject to the terms and conditions upon
which the same were granted to the party of the first part,
together with all and singular the tenements, hereditaments
and appurtenances thereunto belonging or in anywise apper-

taining." Thus this deed refers to the contract of August 11,
1875, between the County company and the Kansas City com-
pany, and to the terms thereof; and the Kansas City company
took its title subject to the terms and conditions imposed upon
the County company by the tripartite agreement. This refer-
ence to the terms and conditions on which the right of way
mentioned in the deed was granted to the Kansas City com-
pany put all the parties to the deed, and their assigns, on
inquiry as to the terms of the contract by which such rights
of way were granted, and led up to the provision in the agree-
ment of August 11, 1875, between the two companies, which
referred to the tripartite agreement in the following language:
" And whereas, under this agreement and a certain agreement
between the parties hereto and the Commissioners of Forest
Park of even date herewith, the party of the second part is
about to, and hereby, in consideration of the covenants and
agreements of the party of the first part, hereinafter par-
ticularly set forth, and of the covenants and agreements of
said Commissioners of Forest Park in said agreement with
them contained, does covenant and agree to construct and
maintain a railroad bed and road in, upon and through said
Forest Park and the tunnel and cut hereinbefore specified,
according to certain plans and specifications agreed upon, and
according to the terms and conditions of said agreement with
said commissioners, for the joint use of both the parties (of
the first part and of the second part) hereto, their several suc-
cessors and assigns." Being thus chargeable with notice of
the contents of the contract of August 11, 1875, between the
County company and the Kansas City company, the mortga-
gees and the purchasing committee were chargeable also with
notice of the tripartite agreement, to which it referred; and
they purchased subject to the terms on which the right of way
was granted. *Kirkpatrick* v. *Peshine*, 24 N. J. Eq. 206;
*Atlantic Dock Co.* v. *Leavitt*, 54 N. Y. 35 ; *Bishop* v. *Schnei-
der*, 46 Missouri, 472 ; *Stevens* v. *Hampton*, 46 Missouri, 404 ;
*Maupin* v. *Emmons*, 47 Missouri, 304; *McCamant* v. *Patter-
son*, 39 Missouri, 100, 110; *Mense* v. *McLean*, 13 Missouri,
298; *Meier* v. *Blume*, 80 Missouri, 179, 184.

The covenant in paragraph 9 of the tripartite agreement created an easement in the property of the County company and the Kansas City company for the benefit of the public, which might be availed of, with the consent of the public authorities, properly expressed, by other railroad companies which might wish to use not only the right of way through the park but also that between the park and the Union Depot. *Whitney* v. *Union Railway,* 11 Gray, 359, 364; *Parker* v. *Nightingale,* 6 Allen, 341, 344; *Wilkinson* v. *Clements,* L. R. 8 Ch. 96; *Perkins* v. *Hadsell,* 50 Illinois, 216; *Stansbury* v. *Fringer,* 11 Gill & J. 149; *Cooper* v. *Pena,* 21 California, 403; *Union Pacific Railway* v. *McAlpine,* 129 U. S. 305, 314; *McMurray* v. *Moran,* 134 U. S. 150.

The two agreements of August 11, 1875, and the deed of that date from the County company to the Kansas City company constituted a single transaction, relating to the same subject matter, and should be construed together in such a way as to carry into effect the intention of the parties, in view of their situation at the time and of the subject matter of the instruments. Contracts of such a character are to be construed liberally in favor of the public when the subject matter concerns the interests of the public. *Parker* v. *Great Western Railway,* 7 Scott N. R. 835, 870; *Colman* v. *Eastern Counties Railway,* 10 Beav. 1, 14; *Canal Co.* v. *Wheeley,* 2 B. & Ad. 792; *Blakemore* v. *Canal Co.,* 1 Myl. & K. 154, 165; *Lee* v. *Milner,* 2 Younge & Coll. Ex. 611, 618; *Ware* v. *Canal Co.,* 28 L. J. Ch. N. S. pt. 1, 153, 157; *Gray* v. *Railway Co.,* 4 Railway Cases, 240.

The Kansas City company, under the agreements, completed its road through the park to the Union Depot in 1876. The agreement between the County company and the Kansas City company provided that the County company should pay to the Kansas City company one-half of the cost of the construction and maintenance of the road-bed through the park and the tunnel and the cut, within two years from August 11, 1875, and that, if the County company should fail or refuse to make payment for sixty days after demand, after it should become due, all the rights, privileges, franchises, powers, immunities, improvements and property of the County company,

in, through or upon Forest Park, and in, into, through, over or upon the tunnel and cut, should become, by virtue of such failure and refusal, without further process or proceedings, forfeited to the Kansas City company, its successors and assigns; that, in case of such forfeiture, no further payments should be made by the County company, but the Kansas City company might enter upon the sole and absolute possession and enjoyment of all such rights, privileges, franchises, powers, immunities, improvements and property, to the exclusion of the County company; and that the latter company should, in such case, convey by deed to the Kansas City company, its successors and assigns, all of such rights, privileges, franchises, powers, immunities, improvements and property. The two years expired in 1877. The County company, having paid nothing, forfeited to the Kansas City company all its interest in the right of way through the park and through the tunnel and the cut east of the park.

By the two agreements and the deed, the Kansas City company obtained from the County company an undivided one-half of the right of way through the park, and the other rights of way, then owned by the County company, between the park and the Union Depot, and, by virtue of the two agreements and the forfeiture, without further action by either the County company or the Park Commissioners, the Kansas City company became vested with the title to the whole right of way through the park, the tunnel and the cut, and became substituted for the County company under the agreements. All the obligations and conditions imposed upon the County company became those of the Kansas City company, except as to building the depot and the switch in the park; and the latter company became subject to the conditions which were imposed on the County company by the tripartite agreement. That agreement created the easement before referred to, which covered the tracks through the park and the tracks east of the park to the Union Depot. *Whitney* v. *Union Railway Co.*, 11 Gray, 359, 364; *Parker* v. *Nightingale*, 6 Allen, 341, 344.

The permission to other railroad companies to use such tracks was a concession to the Park Commissioners, and was

one of the conditions of the grant of the right of way through the park to the County company; and the Kansas City company obtained the title to, and the exclusive possession of, such right of way, under the agreement providing for such permission. It would be inequitable to permit the Kansas City company, or its successor, to continue to use the right of way through the park and at the same time to deprive the Park Commissioners, or their successor, the city of St. Louis, as trustees of the public, of the benefit of the use by other railroad companies of the right of way between the park and the Union Depot. The park was dedicated to the use of the people of the city and county of St. Louis, and it was the duty of their trustees to preserve that use to them, for park purposes. In the view of those trustees, it was necessary, for the protection of the park, that other railroad companies should be permitted to use not only the right of way through the park but also that between the park and the Union Depot. In order to obtain the right of way through the park, the Kansas City company subjected itself to the condition imposed by paragraph 9 of the tripartite agreement, and it is right that that company and its successor should be held to a strict compliance with its covenant. The appellants, although enjoying the benefit of the $40,000 expended by the Park Commissioners and of the right of way through the park, deny their liability under the agreement, without offering to return to the grantors the property obtained by virtue of the agreement. Under such circumstances, these parties cannot be heard to allege that the agreement was against the policy of the law. *Wiggins Ferry Co.* v. *Chicago & Alton Railroad,* 73 Missouri, 413.

In respect to the point that paragraph 9 of the tripartite agreement covers the use by other railroad companies, not only of the right of way through the park, but also of the right of way to the terminus of the County company's road in the city of St. Louis, the Circuit Court very rightly said, in its opinion: "It is argued with great force, however, by counsel for the respondents, that even if the purchasers were charged with notice of these terms and conditions as attaching to the lands described in the deed, inasmuch as the Kansas

road obtained a large portion of its right of way between
Forest Park and the Union Depot from other sources, it took
these latter portions free from any burden cast upon the lands
specifically conveyed by the County road. 'Can it be,' he
says, 'that a condition in a deed of a few feet of the right of
way, in a long line of three hundred miles, casts a burden on
the entire line, to be assumed by every succeeding purchaser?'
I might answer this extreme case by a reverse question: Can
it be possible that a condition attached to substantially the
entire right of way of this long line of road can be defeated
by the fact that some few feet have been acquired by a deed
free from such condition? But these extreme cases do not
constitute the practical matter before us. Here the County
road had an incomplete right of way through the park and
to the Union Depot. A share of this incomplete right of
way it conveyed to the Kansas road subject to certain condi-
tions. Can it be that the completion by the Kansas road of
this right of way, by the purchase of intervening and isolated
tracts, destroys the entire value of the conditions?. Looking
at this matter in a practical way, and from a reasonable
standpoint, I think the answer to this question must. be in the
negative."

In *Bronson* v. *Coffin*, 108 Mass. 175, 180, it was said, the
court speaking by Gray, J.: "An interest in the nature of an
easement in the land which the covenant purports to bind,
whether already existing, or created by the very deed which
contains the covenant, constitutes a sufficient privity of estate
to make the burden of a covenant to do certain acts upon that
land, for the support and protection of that interest and the
beneficial use and enjoyment of the land granted, run with
the land charged. And an obligation, duly expressed, that the
structures upon one parcel of land shall forever be, of a cer-
tain character for the benefit of an adjoining parcel is equally
a charge upon the first parcel, whether the obligation is affir-
mative or merely restrictive, and whether the affirmative acts
necessary to carry the obligation into effect are to be done by
the owner of the one or the owner of the other." And it was
held by the court, where there was a covenant to make and

maintain a fence on a railroad, contained in a deed granting to the road a strip for the right of way, that this covenant was an incumbrance on all the remaining land of the grantor, and ran with that land, because the covenant gave the grantee an interest in the nature of an easement in the adjoining land of the grantor. See also *Western* v. *Macdermott*, L. R. 2 Ch. 72; *Whitney* v. *Union Railway*, 11 Gray, 359, 364; *Parker* v. *Nightingale*, 6 Allen, 341; *Union Pacific Railway* v. *McAlpine*, 129 U. S. 305, 314; *McMurray* v. *Moran*, 134 U. S. 150.

There can be no doubt of the power of the County company and the Kansas City company, under the statutes of Missouri, to make the agreement in question. Gen. Stats. of Missouri of 1866, c. 63, sec. 32, p. 341.

The only right of way through the park and to the Union depot claimed by the appellants is that established by the tripartite agreement. Every other right of way through the park was surrendered, by that agreement, to the Park Commissioners, because that agreement says that the line and grade established by it was thereby fixed "as the sole and finally established right of way to which" the County company was "entitled by statute or otherwise through said park, or any part thereof." Such line and grade were laid down and described on the plat and profile which were attached to the tripartite agreement and formed part thereof. The Park Commissioners expended about $40,000 in complying with their engagements under that agreement. At its date, as testified to by Mr. McKinley, it was feared that the invasion of the park by railroads would not only affect unfavorably the landscape beauty of the park, but would also produce great danger to persons visiting it; and it was a long time before the apprehension was relieved that horses would be frightened. The consideration for the expenditure of the $40,000 was the provision of the tripartite agreement which protected the park and prevented its being defaced and injured by the construction of other railroads through it. The confining of such railroads to the use of the single right of way established was a reasonable precaution. *Hayes* v. *Michigan Cent. Railroad*, 111 U. S. 228; *Mayor of New York* v. *Williams*, 15 N. Y.

502. Such provision was in the interest of the public safety, and the Park Commissioners had the right to exact it.

In case the County company should forfeit its rights in the park, the Kansas City company was to continue to enjoy the right of way on the terms imposed on the County company by paragraph 9 of the tripartite agreement. Such construction of the contract is the only one consistent with fair dealing and the manifest intention of the parties. The tripartite agreement is the only muniment of title under which the appellants now enjoy the right of way. The grant of the right to other railroads to use such right of way through the park and to the Union Depot was a grant to the Park Commissioners, as trustees for the public, and is to be construed liberally. Paragraph 9 is imperative. It provides that the County company "shall permit" other railroads to use its right of way. This is to be done "under such reasonable regulations and terms as may be agreed upon," and "upon such terms and for such fair and equitable compensation to be paid" to the County company "therefor as may be agreed upon by such companies." Not only are the regulations and terms to be reasonable, but the compensation is to be fair and equitable. Although the statement is that the compensation is to be such "as may be agreed upon by such companies," yet the statement that it is to be "fair and equitable" plainly brings in the element of its determination by a court of equity. If the parties agree upon it, very well; but if they do not, still the right of way is to be enjoyed upon making compensation, and the only way to ascertain what is a "fair and equitable" compensation therefor is to determine it by a court of equity. Such is, in substance, the agreement of the parties. The provision cannot be construed as meaning that, if the parties do not agree, there is to be no compensation, and that, because there can in that event be no compensation, there is to be no enjoyment of the right of way. In this view, it cannot be said that the court is making an agreement for the parties which they did not make themselves. *Emery* v. *Wase*, 8 Ves. 505; *Milnes* v. *Gery*, 14 Ves. 399; *Gregory* v. *Mighall*, 18 Ves. 328; *City of Providence* v. *St. John's Lodge*, 2 R. I. 46; *Dike* v. *Greene*, 4 R. I. 285.

On the question whether paragraph 9 of the tripartite agreement covers not merely the right of way through the park and up to the terminus of the road in the city of St. Louis, but also the tracks for that extent, the opinion of the Circuit Court very properly says : " The language of the ninth paragraph, under which, as before noticed, intervenors must claim, is that the party of the second part shall permit other railroads to use its 'right of way.' Now, the term 'right of way' has a twofold signification. It sometimes is used to describe a right belonging to a party, a right of passage over any tract ; and it is also used to describe that strip of land which railroad companies take upon which to construct their road-bed. Obviously, in this paragraph, it is used in the latter sense. Through both of these contracts the terms 'right of way,' 'track,' and 'road-bed' frequently appear, and in all cases the term 'right of way' is used as descriptive of the strip above referred to. Notably, in the fifth paragraph, is the distinction between the 'right of way' and the 'track' disclosed, in which it is provided that the depot shall be wholly outside of the right of way, but immediately adjoining the track. Now, the right of way through the park, as given by the Griswold deed, was 40 feet; as fixed by the contract with the Forest Park Commissioners was 70 feet; and by this present contract, 42 feet. So the County road conveyed to the Kansas road, outside of the park, a strip either 30 or 28 feet in width for its right of way. My thought, at first, was that the intervenors could only claim a right to use so much of this right of way as was not, in fact, occupied by the track of the Wabash, and that all that was intended by this ninth paragraph was to permit other railroad companies to occupy and use so much of the Kansas road's right of way as it did not itself occupy and use ; but, after reflection on the arguments of counsel, I have been led to the conviction that this was too narrow a construction, and was not the real intent of the parties. The master, in his report, shows that the entire right of way is occupied by tracks and sidings, so that there is no room for another and independent track ; and as there is nothing to show that this occupation has not been made in good faith, and to supply

the needs of the Wabash company, if my first interpretation had been correct, the intervenors would plainly be without any rights. I think, however, the true construction is this: that the Kansas company was to have the first right — a right not limited to its necessities, but as broad as its convenience. Subject, and only subject, to such prior right, other companies were to have the use of the right of way, and if the respondent's business compelled the occupation by its tracks or sidings of the entire right of way, but the convenience of its business would permit the use of those tracks and sidings by another road, then such other road would be entitled to the use of both the right of way and the tracks and sidings. This construction is, I think, in accordance with the obvious intent of the parties, who were contracting for general rights, and not fixing the specific details."

The evidence shows that the entire right of way is occupied with tracks and sidings, so that there is no room for another and independent track, and that the entrance into the Union Depot over the tracks of the Wabash company is the only practical route for the road of the Colorado company to that depot. As the Kansas City company had the right to cover its right of way with main and side-tracks, so that there should be no room on such right of way for the tracks of another railroad, it would be in its power to defeat the intent of the agreement, if the right of way should be held not to include the tracks. Moreover, as the County company and the Kansas City company were tenants in common of the right of way through the park and to the east end of the cut, each company had the right to use the whole of the right of way, subject to the right of the other company to use the whole of it. Hence, the grant to other roads of the privilege of using the right of way applied to the whole of such right of way through the park, and not to a particular part of it. The track cannot be separated from the right of way, the right of way being the principal thing and the track merely an incident. A right of way is of no practical use to a railroad without a superstructure and rails. The track is a necessary incident to the enjoyment of the right of way. The record shows that the railroad

of the Colorado company is of the same gauge as that of the Wabash company, and that it is entirely practicable for the Colorado company to use the tracks of the Wabash company from the north line of the park to the Union Depot, subject to the reasonable rules and regulations of the Wabash company.

The appellants having denied all right of the Colorado company under the tripartite agreement, it became necessary for the intervenors to come into a court of equity; and the court, having taken cognizance rightfully of the subject matter in controversy, has the power to settle not only the right but also the amount of compensation. The action of the Circuit Court was, in effect, to enforce the specific performance of the agreement. The offer by the Colorado company, in its bill, to pay a fair and equitable compensation, with its prayer to have such compensation determined by the court, brought the matter within the cognizance of the court, the other party having substantially agreed, by paragraph 9 of the tripartite agreement, that the compensation should be determined by a court of equity. The prayer for an injunction to restrain the Wabash company and its receiver from refusing to permit the Colorado company to use the right of way of the Wabash company from the north line of the park to Eighteenth Street, is a prayer for all that is necessary to secure practically the specific performance of the agreement. *Dinham* v. *Bradford*, L. R. 5 Ch. 519; *Tillett* v. *Charing Cross Bridge Co.*, 26 Beav. 419; *Raphael* v. *Thames Valley Railway*, L. R. 2 Eq. 37; *Tscheider* v. *Biddle*, 4 Dillon, 55; *Biddle* v. *Ramsey*, 52 Missouri, 153; *Arnot* v. *Alexander*, 44 Missouri, 27; *Hug* v. *Van Burklee*, 58 Missouri, 202; *Gregory* v. *Mighell*, 18 Ves. 328.

The right to use the right of way is a continuing right. If the remedy were to be at law, repeated actions for damages would be necessary. The remedy at law would be wholly inadequate. It would not secure directly the enforcement of the provision of paragraph 9 of the tripartite agreement, or the use of the right of way by the Colorado company. It would be neither plain or complete, nor would it be a reasonable substitute for the remedy in equity, by the injunction asked for.

The appellants rely largely upon cases of the character of that of *Marble Co.* v. *Ripley*, 10 Wall. 339, where this court refused to enforce the specific performance of a personal contract to deliver from a quarry marble of certain kinds and in blocks of a specified kind, holding that, as the duties required of the owners of the marble quarry were continuous, and the agreement was one for a perpetual supply of marble, the court could make no decree which would end the controversy, and the case would have to remain in the court forever, with the liability on the part of the court to be called upon, to the end of time, to determine, not only whether the 'prescribed quantity of marble had been delivered, but whether every block was from the right place, and was sound, and of suitable size or shape or proportion ; and it was held that it was impracticable for the court to superintend the execution of such a decree.

In the present case, it is urged that the court will be called upon to determine from time to time what are reasonable regulations to be made by the Wabash company for the running of trains upon its tracks by the Colorado company. But this is no more than a court of equity is called upon to do whenever it takes charge of the running of a railroad by means of a receiver. Irrespectively of this, the decree is complete in itself and disposes of the controversy ; and it is not unusual for a court of equity to take supplemental proceedings to carry out its decree and make it effective under altered circumstances.

Considerations of the interests of the public are held to be controlling upon a court of equity, when a public means of transportation, such as a railroad, comes into the possession and under the dominion of the court. These considerations have been recognized and applied by this court in several cases. *Barton* v. *Barbour*, 104 U. S. 126; *Miltenberger* v. *Logansport Railway*, 106 U. S. 286, 311, 312; *Union Trust Co.* v. *Illinois Midland Railway*, 117 U. S. 434, 458.

The Circuit Court having adopted the rate of compensation insisted upon by the appellants, and the Colorado company not having taken an appeal, the question of the rate of com-

pensation is concluded between the parties. So also is the question that the rules and regulations for the running of the trains of the Colorado company are to be those prescribed by the Wabash company and its successors.

In view of the testimony as to the use, by agreement, of the tracks of one railroad company by the engines and cars of another, the practical difficulties insisted upon of carrying out the regulations laid down in the decree of the Circuit Court amount to very little, if anything. That these regulations are practical is shown by the agreement of August 11, 1875, between the County company and the Kansas City company, in that provision thereof, which is as follows, and which was adopted to a certain extent by the Circuit Court in its decree: " It is agreed and covenanted that to accommodate the running arrangements of the party of the second part said party of the second part shall have the absolute and sole control of the running, starting and regulating of the time-tables of and for its own trains; and it is further agreed and covenanted that no train, locomotive, car or other conveyance of the party of the first part, its successors or assigns, shall be allowed or attempted to be started or run within eight (8) minutes of the time fixed or stated for the starting, coming in or running of the train or trains of the party of the second part, its successors or assigns; and there shall be twenty minutes' time between the starting and coming in of the trains of the party of the second part, and this matter as to said specified times shall be under the sole control and regulation of the party of the second part." It is to be noted, however, that the agreement referred to gave to the Kansas City company the control only of its own trains, while the decree gives to the Wabash company the control of all the trains to be run over its tracks, with the proviso that the trains of the Colorado company shall not be started or run within eight minutes of the time fixed for the starting, coming in or running of the trains of the Wabash company. The latter company is required only to make reasonable rules and regulations for the running of the trains of the Colorado company. The Wabash company is to fix the time-tables, and the trains of the Colorado company

are to be operated on the tracks of the Wabash company, subject to the rules and regulations of the latter company so long as a train of the former company occupies the tracks of the latter company.

It is objected that the details of the manner of the use of the right of way are not set forth in paragraph 9 of the tripartite agreement, and that, therefore, a court of equity will not decree a specific performance. But, viewing the two agreements of August 11, 1875, as a single contract, the details as to the manner of use of the right of way are sufficiently furnished by agreement of the parties, for it is provided by the agreement of August 11, 1875, between the County company and the Kansas City company, not only that the latter company shall have the absolute and sole control of the starting, running and regulating of the time-tables of and for its own trains, but also, that the matter of the relative times of the starting, coming in and running of the trains of the County company and of those of the Kansas City company shall be under the sole control and regulation of the latter company, its successors and assigns.

The case of *Texas & Pacific Railway Co.* v. *Marshall*, 136 U. S. 393, is much relied upon by the appellants; but the principle of that case does not apply to the present one. There, the court held that, if the railroad company was under a contract with the city of Marshall to keep there its principal office of business and its main machine shops and car works, it was much more consonant to justice that the injury suffered by the city should be compensated by a single judgment in an action at law; that there was no substantial difficulty in ascertaining such compensation; and that, therefore, the city had a complete remedy at law. But in the present case, the remedy in damages by an action at law would be entirely inadequate, and nothing short of the interposition of a court of equity would provide for the exigencies of the situation. See, also, *Wilson* v. *Northampton &c. Railway Co.*, L. R. 9 Ch. 279,

The decree of the Circuit Court is so framed as to execute itself. It finds that the rules and regulations now in force for the running of trains over the right of way and tracks of the

Wabash company, and which are set forth in the record, are reasonable rules and regulations. So long as they are undisturbed, there is no occasion for the action or interposition of the court.

The fact that the railroads which are to be allowed, under paragraph 9 of the tripartite agreement, to use the right of way through the park and up to the terminus in the city of St. Louis, are not named in that paragraph, is of no importance. *Wolverhampton Railway Co.* v. *London and Northwestern Railway,* L. R. 16 Eq. 433 ; *Express Cases,* 117 U. S. 1; *Railway Co.* v. *Alling,* 99 U. S. 463.

Railroads are common carriers and owe duties to the public. The rights of the public in respect to these great highways of communication should be fostered by the courts; and it is one of the most useful functions of a court of equity that its methods of procedure are capable of being made such as to accommodate themselves to the development of the interests of the public, in the progress of trade and traffic, by new methods of intercourse and transportation. The present case is a striking illustration. Here is a great public park, one of the lungs of an important city, which, in order to maintain its usefulness as a park, must be as free as possible from being serrated by railroads ; and yet the interests of the public demand that it shall be crossed by a railroad. But the evil consequences of such crossing are to be reduced to a minimum by having a single right of way, and a single set of tracks, to be used by all the railroads which desire to cross the park. These two antagonisms must be reconciled, and that can be done only by the interposition of a court of equity, which thus will be exercising one of its most beneficent functions.

As to the objection that there is no mutuality in the contract, and therefore it cannot be enforced, the Circuit Court says in its opinion : "As to the objection on the ground of the want of mutuality in the contract, I think it of little force. The respondent has been paid for the privilege that is now claimed. The consideration, as I have heretofore shown, was ample ; and, when a party has received payment for a privilege, I do not think it can resist the enforcement of that privi-

lege on the mere ground that it cannot compel the other party to continue in its enjoyment." We concur in this view. Under the tripartite agreement, the right of way through the park was obtained by the Kansas City company, and, in consideration of the covenants contained in paragraph 9 and other paragraphs of that agreement, $40,000 were expended by the Park Commissioners in aid of the construction of the railroad through the park, upon the right of way granted. Things were to be done by each party for valuable considerations to be paid by one to the other. The Park Commissioners complied in all respects with the agreement. Although the one easement was granted in consideration of the other, the appellants refused to permit the enjoyment of the easement which they granted. The want of mutuality is urged when the appellants are called upon to comply with the covenant which is valuable to the city of St. Louis and the public whom that city represents. Such want of mutuality is alleged to consist in the inability of the appellants to prevent other railroads which may use the right of way from discontinuing such use, and in the fact that the contract did not specify the period during which the other railroads should be required to use the right of way. But we think that there is no such want of mutuality as should interfere with the enforcement of the contract.

It is insisted that the County company had no power to bind itself to grant the use of its right of way east of the park. But the appellants do not occupy a position to insist upon that objection, so long as they themselves use the right of way which was granted, and enjoy the benefit of the money which the Park Commissioners expended.

The city of St. Louis is, in the present case, not merely a nominal party, but is charged with the duty of protecting the park, and of preserving and fostering the commerce of the city. Both of those objects are clearly set forth in the tripartite agreement executed by the Park Commissioners, of whom the city of St. Louis is the successor; and the considerations thus arising are legitimate ones in a court of equity, the case being founded upon the tripartite agreement.

*Decree affirmed*