### THE PEOPLE *v.* DÍAZ ALIAS LEÑA VERDE.

#### APPEAL from the District Court of Humacao.

No. 55.—Decided March 6, 1907.

APPEAL—EVIDENCE—VERDICT—NEW TRIAL.—The probative force to be given to evidence for the prosecution which is contradicted or explained by the evidence for the defense is a matter within the exclusive province of the jury, and is not subject to review by the appellate court; and where the verdict is contrary to the weight of the evidence the defendant should, on that ground, move for a new trial, the power to grant or deny which is discretionary.

ID.—VERDICT MANIFESTLY ERRONEOUS OR THE RESULT OF PARTIALITY, PASSION
OR PREJUDICE.—As a general rule the Supreme Court will not review the
decision of the jury upon a question of fact unless it is clearly erroneous or
the result of partiality, passion or prejudice.

ID.—RECOMMENDATION OF CLEMENCY.—A judge is not bound to mitigate the
punishment to be imposed upon a defendant simply because the jury in ren-
dering its verdict recommends him to the clemency of the court, because aside
from the fact that such a recommendation cannot be considered as a part of
the verdict, in rendering which the jury should confine itself to finding the
defendant guilty or not guilty, and in proper cases indicating the degree of
the crime, the judge is charged with the responsibility of pronouncing sen-
tence upon the accused and may, therefore, disregard such a recommendation.

The facts are stated in the opinion.

*Mr. Vías Ochoteco* for appellant.

*Mr. Rossy, fiscal,* for respondent.

MR. JUSTICE MACLEARY delivered the opinion of the court.

This case was prosecuted and decided in the District Court
of Humacao, where an information was presented against the
accused, Demetrio Díaz, for the murder of Agustín Belford,
alleged to have been committed on the 28th of January, 1905,
in the district of Humacao. The date of this information is
the 9th of March, 1905. The accused was formerly convicted
of murder in the first degree and the punishment assessed at
death. From this judgment he took an appeal to this court,
and on the 20th of April, 1906, secured a reversal of the judg-
ment prononunced against him in the court below. Mr. Chief
Justice Quiñones rendered the opinion of the court, basing
the reversal on the ground that the verdict was informal, be-
cause the jury failed to name the degree of the murder of
which they convicted the defendant, referring to a former de-
cision of this court in the case of *Panchito,* and to other
authorities. On the 10th of May, 1906, the case was set for
trial in the District Court of Humaco, to take place on the
18th of June following.

The second trial took place on the 19th of June,, 1906. The
verdict of the jury on that trial was that the accused was
guilty of murder in the second degree, with a recommenda-
tion of clemency in his behalf. The trial judge gave a long
and able charge to the jury, including some instructions asked

by the defense in regard to the matter of reasonable doubt. No complaint is made of this charge, and it needs no further notice at this time.

On the 25th of June, 1906, the accused was sentenced to perpetual imprisonment at hard labor in the penitentiary, and to the payment of the costs. On the 25th of August thereafter, defendant's counsel gave notice of appeal. On the 26th of November last the transcript of the record was filed in this court. On the 22d of January of this year J. F. V. Ochoteco, Esq., filed an affidavit here in seeking a postponement of the hearing in the Supreme Court until the last days of February, alleging that an agreement existed between the *fiscal* of the Humacao district and the attorney for the defense to extend the time for the preparation and presentation of the state ment of the case until the last days of February; and that the secretary of the District Court of Humacao, not taking into account this agreement, had sent up the record in the case to the Supreme Court. That it was the intention of the attorney to present the said document within the time agreed upon between him and the *fiscal*. The case was thereupon set down for hearing on the 15th of February, and on the 5th of February the attorney filed in this court a document styled a bill of exceptions of the case (*pliego de excepciones del caso*). This statement gives the testimony of the witnesses in narrative form, and also sets out two legal grounds on which the accused seeks a reversal of the judgment—that is to say:

First. That the verdict is contrary to the evidence; and that from the facts proven the offense could be no greater than manslaughter.

Second. That it was an excess of rigor upon the part of the trial court to sentence the defendant to perpetual imprisonment when the jury had recommended him to the mercy of the court.

This statement of the case was agreed to by counsel both for The People and the defense, and approved by the court. The case was heard in this court on the 15th of February on

oral argument of both parties, no brief being filed by either party, except a short report of the *fiscal* covering a portion of a page presented on the 20th of December last, before the statement of the case had been received in this court.

The first ground on which the accused seeks a reversal of the judgment requires a complete review of the testimony considered by the trial court, and on which the verdict of the jury was based.

The evidence introduced on the trial may be condensed from the bill of exceptions as follows:

"1. The witness Dr. Pablo Font° Martelo, testified that he knew Agustín Belford, who died from wounds sustained on the night of the 28th to 29th of December, 1905, one in the neck and the other in the back between the ribs, and which penetrated the lungs; that the wound in the neck was inflicted after the agressor was wounded, and the one in the back was inflicted by the agressor passing the right hand, in which he held the knife, under the left arm of the wounded man; that he has formed that conviction from the direction of the wound, because generally a person desiring to inflict a wound in the back will adopt that position on account of the ease with which it may be done; that the wound penetrating the lung caused the death of the deceased by a process of inflammation; that the said wounds were dressed and treated, all the means known to science being used.

"2. The witness Ernesto Belford testified that he is the son of Agustín Belford; that Demetrio and Nicolás Gómez and Facio, passing the house of Demetrio, the latter said that he was going to bathe himself in the blood of witness' father, who was back in the kitchen, and proceeded to give him some advice; that he did not see when Demetrio struck him, but saw them when they clinched and fell to the ground; that he then squatted behind some *pacholí* bushes; that Facio said: 'Run, Ernesto, they will catch you!' and that his father told him to go look for Sánchez, and that when he reached the house his father was already there; that he saw his father wounded, when they clinched; that Belford was in the kitchen of his own house; that Demetrio Díaz came in a bad form saying insulting words; that Nicolás Gómez accompanied him; that he saw nothing in his hands; that he has a sister, Antolina Belford, who was near; that he does not know whether Belford attacked Demetrio Díaz, or whether Díaz attacked Belford, because the night was dark; that he did not see

his father all the time he was clinched with Demetrio, and that his father spoke to the latter in a proper manner; that at about 10 o'clock in the evening his father was tying an animal behind the kitchen; that Díaz said he was going to bathe himself in the blood of that English negro; that Díaz was accompanied by Facio and Nicholás, and that the former bade him run away; that he is sure that Nicholás Gómez was there, and when he came out from behind the bush he was also there; that before hiding he was in the house in bed, and when he heard Díaz say what he did, he got up; that when Díaz made the statement about the English negro his father was outside of the house and he then went in and got a small iron rod and again went out, he does not know where; that besides Demetrio Díaz, the individual Nicholás Gómez took part in the encounter with his father; that only Díaz and Belford clinched; that his mother's name is Felipa Díaz, and is the concubine of Demetrio Díaz; that the quarrels between Demetrio Díaz and Belford were caused by Díaz correcting his father's children, which his father did not like; that his father used the small iron rod to carry with him on account of the dogs.

"3. The witness Nicolás Gómez testified that he knew Agustín Belford, and that the last night he saw him was the night on which he was wounded by Demetrio Díaz; that Díaz passed his house that night, said good evening, and passed on; that about 1 o'clock in the morning the witness went out with Bonifacio Gutiérrez, and on the road passed the house of Belford, and found him wounded; further on they met Demetrio Díaz who said: 'I have taken that small iron rod from the hands of Agustín Belford'; that when Díaz said that he ran to see if he could find one of the children of Belford, so that he might notify the justice of the peace; that he ran because he was afraid of Díaz; that Díaz had attempted to punish him before; that Belford told him that Díaz had wounded him; that Ernesto Belford was not there; that he saw Belford on the road near the house with a wound in the front part of his body; that Demetrio Díaz was about two yards away, and that he saw nothing in his hands, the night being dark; that he talked with Belford, and he told him where he was wounded, and also that Demetrio Díaz had wounded him; that when the wounded man spoke large quantities of blood come out; that he saw no weapon on Díaz, not having reached the spot where he stood.

"4. Bonifacio Gutiérrez testified that he lives in *barrio de* Buena Vista of Humacao; that he went out to attend a rosary and had to pass the house of Belford, and when he was passing the said house he heard Demetrio Díaz say: 'Come here, I am going to finish killing

you!' That he continued on his way and met Agustín standing near the house, and that he then continued to the place he started to go; that the foregoing words were spoken by Leña Verde; that when he said those words he started out to run, because he (Leña Verde) was a man who was always saying things insulting; that he had had quarrels with Leña Verde before; that he did not see whether Leña Verde had anything in his hands; that Belford and Leña Verde were always quarreling on account of Felipa Díaz, who was the wife of Belford and lived with Demetrio Díaz, and had children by Belford; that Belford admonished Leña Verde to be quiet; that he did not see Ernest Belford, but that he did see Belford the master workman; that he heard Demetrio as he, the witness, passed; that Belford was near the house, and that Demetrio Díaz was attempting to hit him; that another night about two months before Leña Verde had told him (Belford) that wherever he saw him he was going to kill him.

"5. Antolina Belford, daughter of Agustín Belford, testified that the cause of her father's death was Demetrio Díaz, and that she knows that the said Díaz wounded her father, because he told her so; that the crime was committed at night after she had gone to bed, at about 10 o'clock; that her father reached the house with his hand on his throat, and in reply to her inquiry said that the infamous Demetrio had wounded him; that she heard Demetrio Díaz say that her father stunk like an English negro; that she knew the voice of Díaz, who lived near by, and said those words in an ordinary voice; that they all lived on the land of Felipa Díaz; that Leña Verde had lived with Felipa Díaz a year and four months; that Belford continued to live on the land of Felipa after she had gone with Leña Verde; that she lived with her mother, and Belford gave Demetrio Díaz advice, because Demetrio said so; that she heard those words the night of the tragedy, about an hour before; that she saw Ernesto Belford when he came to look for Tomás Sánchez.

"6. Tomás Sánchez testified that he was the son-in-law of Belford, and that Belford and Díaz had quarreled before, because the latter whipped his children; that Demetrio Díaz kept the wife of Belford; that Belford lived on land of Carmelo Díaz and that Demetrio Díaz also lived there; that when Felipa Díaz went with Demetrio she had not lived with Belford for sometime; that they had been separated; that he had one child in his house, but not the others, because the mother would not give them to him; that Demetrio Díaz, outside of punishing his children did not show any disrespect to Belford.

"7. Rafael Tirado, municipal judge, testified that he held the preliminary hearing in the case of *People* v. *Díaz*; that he seized a small iron rod; that he made an investigation, together with the *comisario* of the ward and the submarshal of the court; in the house of the accused they found a small iron rod stained with blood, and upon being asked the wife of Díaz said that Demetrio Díaz had brought it; that when Belford testified before the municipal judge it could be seen that he was very ill, and that he would die testifying everything in connection with the crime; he having testified that the said individual had come to his house, said some offensive words, and that he had gone outside himself, and that the other struck him with a knife causing him a wound; that he clinched to defend himself and received the other wound; that the wounded man had told him that there were present two big boys and one of them urged the other on to hit him; that he believes he told him it was one Torres or Sánchez, he does not remember well; that Belford stated to him that he being in his house that man came there accompanied by two individuals; that he insulted him, and that he tried to get the other to withdraw, but he would not obey him; that he attacked him, assisted by one of those individuals, and struck him a blow; that when he clinched and tried to defend himself the other gave him another blow; that the wounded man referred to Demetrio Díaz; that he spoke of another person, but that he does not remember whether his name was Sánchez or Torres.

"8. The witness Lorenzo Isern testified on the date of the crime he was in Humacao; that he knew Agustín Belford, and that he remembers that he testified before the municipal judge, while he was seriously wounded, but that he was in his proper mind, and that he, the witness, signed the declaration produced by authority given him by Belford.

"9. The witness Schabee testified that in January of the last year he became acquainted with Agustín Belford, and that when the latter was wounded he called him as his pastor, because he felt he was dangerously wounded; that he told him that he came home and that there was a man outside insulting him; that he went outside and grabbed him, and before he knew it he was wounded twice.

"10. Rafael Tirado Verrier, being recalled, testified that he seized a small iron rod, which was delivered to him at his house by the submarshal; that it was the same rod; that he found on it a stain which appeared to be blood.

"11. Ernesto Belford, being recalled testified that he knows the iron rod presented as the same which his father took out that night, and that he always took it by the handle.

"12. Dr. Isidro A. Vidal testified that he had known Demetrio Díaz for some time, and that he examined this individual on the request of the defense, and found on his right arm a wound which was caused by a hard object, as an iron or a stick; that the wound was six or eight months old when he made the examination; that said wound may have been caused with a small rod, or sharp stick; that he could not state the day on which the wound was inflicted, but only approximately.

"13. Dr. Pablo Font Martelo, being recalled, testified that he examined Demetrio Díaz and found a wound on his right arm; that it had been five or six months since he made the examination; that the said wound was superficial; that the said wound may have been caused by a rod or any other hard, sharp object; that the wound of Belford produced but little bleeding, and that the wound in the back bled the most and caused his death.

"14. The accused Demetrio Díaz, testified that he knew Agustín Belford ,and that he lived with a woman, who was formerly the wife of the said Belford, a concubine; that he knows the rod presented to him, and that it is that of Agustín Belford; that he was going out of town, and that on passing the house of Nicolás Gómez, he told him to wait for him; that he waited, and on reaching the front of the house of Agustín Belford the latter came out to the road with that road, and without saying a word hit him with it, and they had a quarrel, and Nicholás took part in the same; that he carried no weapon, and when they clinched he took the rod and took it to his house; that he then remained in his house, and Nicolás and Facio made him flee; that he was fleeing, and wrote to Don Emilio to go and get him; that he presented himself to Don Emilio, and since then has been turned over to the courts; that he worked at the *hacienda* Constancia while hiding, and changed his name, because he heard the police were after him; that Nicolás Gómez had a knife with a horn handle, and that he tried to get him to take it, when he had the quarrel, but he would not accept it; that he did not see which was the first wound that was given; that he had a pair of pants and a shirt which were stained with blood from the wound on his forearm; that on passing with Nicolás Gómez in front of the house of Belford the latter come out to the road and struck him a blow, and the witness fell to the ground; that he and Belford clinched and fell to the

ground, and then he took the rod, and saw Gómez strike (Belford) with the knife; that he carried no weapons on that night; that Belford did not support his children, and had never claimed them; that he educated them, and as Belford did not work he never sent anything to support them.

"15. The witness Antonio Belford testified that she heard Demetrio Díaz say, after the crime had been committed, 'Here *compay,* (godfather) take that knife and break it'; that she did not know what was done with the knife, and heard nothing more; that Belford used a rod when he went out; that the truth was that Díaz said to Nicolás Gómez, 'Take that knife and throw it away.'

"16. The witness Nicolás Gómez, being recalled, testified that he had not wounded Belford, who to him was a father; that he defended his family and saved them from the cyclone; that he reached the scene of the crime after Belford had been wounded, and that he did not see Leña Verde there; that he was accompanied by Bonifacio.

"17. The witness Bonifacio Gutierrez, being recalled, testified that he did not see Nicolás Gómez wound Belford, and that he did not see the rod in the hands of Leña Verde."

From a careful consideration of the facts which must be deduced from the foregoing statement, we cannot agree that the jury were not warranted in finding a verdict of murder in the second degree. It is true, had a verdict of manslaughter been found by the jury it would not have been disturbed by this court, but certainly the facts show that the murder was committed with implied malice—that is to say, with a deliberate intention unlawfully to take away the life of the deceased, no considerable provocation appearing, and under the circumstances showing an abandoned and malignant heart. It is useless to say what would have been the decision of this court had the verdict been for murder in the first degree, a former judgment condemning the accused to death having been set aside for informality in the verdict in the absence of a bill of exceptions, or statement of facts, showing the evidence adduced on the trial.

It is a question which has been the subject of considerable discussion as to how far an appellate court will go in reversing a judgment on the ground that the verdict of the jury is not

supported by the evidence. A great majority of the cases to be found in the books hold that the decision of a jury on the facts should not be disturbed on appeal. A minority of the cases have held, quite as consistently, that if the evidence is insufficient to sustain a verdict that it should be set aside on appeal. But the opinions in the cases very often fail to state how far an appellate court can proceed in considering the weight of the evidence in criminal cases on which the verdict of the jury is based. It would perhaps be very difficult, if not impossible, to deduce from the reported cases a rule on this subject which can be considered as having been adopted by all the courts. In Florida, Texas and Illinois the courts have held that a reasonable doubt as to the guilt of the accused in the minds of the appellate court is a sufficient reason for the reversal of a judgment of conviction. In many other States, among them Idaho, Indiana, Iowa, Kentucky, Louisiana, Missouri, New York and Virginia, it may be said to be the rule established by the decisions that a judgment in a criminal case will not be disturbed on the ground that the verdict is not supported by the evidence, except in cases where there is a total failure of evidence, or it is so weak and unsatisfactory that the necessary inference to be drawn therefrom is that the verdict is the result of partiality, passion or prejudice. The latter rule has been upheld by the Supreme Court of the United States in the case of *Crumpton* v. *United States,* 138 U. S., 36. And in California it is announced as the decision of its court of last resort that only questions of law can be considered on appeal, and if there is any evidence to justify the verdict of the jury it cannot be disturbed. (*People* v. *Williams,* 59 Cal., 674; *People* v. *Smallman,* 55 Cal., 185.)

This matter is discussed, though briefly, in a note to the case of *Armstrong* v. *The State of Florida,* to be found reported in 17 Lawyers' Reports Annotated, on page 484. We concur in the rule laid down by the Supreme Court of the United States in the case referred to above, that the weight of the evidence introduced by the State, to the extent to which

it was contradicted or explained away by witnesses on behalf of the defendant, are questions exclusively for the jury, and not reviewable upon error in the appellate court. If the verdict was manifestly against the weight of evidence, defendant should have moved for a new trial on that ground in the court below, but the granting or refusing of such a motion is a matter of discretion in the trial court. It may be said generally that this court will not review the decision of the jury upon a question of fact, unless it is clearly erroneous, or the result of partiality, passion or prejudice.

The second objection made by the accused to the judgment of the court below is founded on no better basis. It is true that the jury recommended the defendant to the clemency of the court, and the court sentenced him to the utmost limit of the law under the verdict which was rendered against him. The recommendation of the jury doubtless received due consideration by the trial judge, but he was not bound to adopt the recommendation, nor to mitigate the sentence on account thereof. The law places upon him the responsibility of fixing the sentence (Code of Criminal Procedure, sec. 319), and the jury's duty is completed when it has found the defendant guilty or not guilty (Code of Criminal Procedure, sec. 283), and in cases of this kind, indicated the degree of the crime which he had committed. (Code of Criminal Procedure, sec. 284.)

Our statute in regard to verdicts, section 283, Code of Criminal Procedure, is entirely similar to that of California as contained in section 1151 of the Penal Code of that State. In construing a verdict, containing a recommendation to mercy, similar to the one in the case at bar, the Supreme Court of California says:

"The verdict of the jurors was accompanied with a recommendation to mercy. The court directed the verdict to be entered without the recommendation. There was no error in this direction. The recommendation was addressed solely to the court, and constituted no part of the verdict." (*People* v. *Lee*, 17 Cal., 79.)

In this decision we entirely concur. The jury should not go outside of the law and encumber their verdicts with irrelevant matter. If questions in regard to clemency in pronouncing the sentence are to be considered by the court the Code makes provision for them, and in sections 320 and 321, Code of Criminal Procedure, directs how they are to be presented. There was no error in rendering the judgment in the record on the verdict of the jury.

Taking this view of the law and the facts disclosed by the record, the judgment of the court below should be in all things affirmed.

*Affirmed.*

Chief Justice Quiñones and Justices Hernández, Figueras and Wolf concurred.