In re John Dale TROTTER, Debtor.

First Tennessee Bank National Association, Plaintiff,

v.

John Dale Trotter, Karen Tudor Trotter, Dean Humphrys, Tanya Humphrys, Dallas Coffman, Jean Coffman, Bill Green, Claudine Green, Coffman Oil Company, T & H Enterprises, LLC, Trotter Enterprises, LLC, d/b/a Trotter Amoco, Humphrys Enterprises, LLC, and Pat Stapleton, Receiver, Defendants.

Bankruptcy No. 01–30856.
Adversary No. 01–3081.

United States Bankruptcy Court, E.D. Tennessee.

Sept. 7, 2001.

818

McGehee, Newton & Wykoff, P.C., John
P. Newton, Jr., Cynthia T. Lawson, Knox-
ville, Tennessee, for the debtor.

Winchester, Sellers, Foster & Steele,
P.C., J. Michael Winchester, E. Brian Sell-

ers, Knoxville, Tennessee, for First Tennessee Bank National Association.

Hagood, Tarpy & Cox, PLLC, Edward J. Shultz, Knoxville, Tennessee, for Trotter Enterprises, LLC.

Stone & Hinds, P.C., George F. Legg, Knoxville, Tennessee, for Dallas Coffman, Jean Coffman, Bill Green, Claudine Green, and Coffman Oil Company.

## *MEMORANDUM ON MOTION FOR SUMMARY JUDGMENT AND MOTION TO AMEND ANSWER*

RICHARD S. STAIR, Jr., Bankruptcy Judge.

On June 22, 2001, First Tennessee Bank National Association (First Tennessee) filed a Complaint to Determine the Validity, Extent and Priority of Liens and Interests in Property (Complaint). By its Complaint, First Tennessee asks the court to determine the extent and priority of various parties' interests in a commercial Lease Agreement (Lease) executed by the Debtor. Specifically, First Tennessee asks the court to find that it or any subsequent foreclosure transferee under the Lease is not required to comply with the terms of a Supply Agreement also executed by the Debtor. On August 2, 2001, First Tennessee then filed a Motion for Judgment on the Pleadings and/or for Summary Judgment and for Scheduling Order (Summary Judgment Motion).

Defendants Dallas Coffman, Jean Coffman, Bill Green, Claudine Green, (the Landlord) and Coffman Oil Company[1] (Coffman Oil) (collectively, the Coffman Defendants) filed an Answer on July 23,

2001. Coffman Oil then filed a Motion to Amend Answer and File Permissive Counter–Claim (Motion) on August 3, 2001. The Motion asks the court to allow the Coffman Defendants to amend their answer to allow Coffman Oil to assert a permissive counter-claim against First Tennessee to determine the parties' rights relating to an Incentive Contract and Addendum to Incentive Contract between Coffman Oil, First Tennessee, and Defendant Trotter Enterprises, LLC, d/b/a Trotter Amoco (Trotter Enterprises).

Answers were also filed by the Debtor on July 24, 2001, and by Trotter Enterprises, LLC on July 25, 2001. Additionally, on August 15, 2001, the Debtor filed a Response of John Dale Trotter to Motion for Judgment on the Pleadings and/or for Summary Judgment and a Response of John Dale Trotter to Motion for Motion [sic] to Amend Answer and File Permissive Counter–Claim. Finally, on August 17, 2001, First Tennessee filed a Response and Objection of First Tennessee Bank to Motion to Amend Answer and File Permissive Counterclaim, and the Coffman Defendants filed their Response to First Tennessee Bank National Association's Motion for Judgment on the Pleadings and/or for Summary Judgment and for Scheduling Order.[2]

First Tennessee, Trotter Enterprises, the Debtor, and the Coffman Defendants have briefed their respective positions. The court heard oral arguments on First Tennessee's Summary Judgment Motion and on the Coffman Defendants' Motion on August 28, 2001.

---

**1.** This Defendant's correct name is Coffman Oil Company, Inc. It is undisputed that Coffman Oil is a corporation.

**2.** No response has been filed by Defendants Karen Tudor Trotter, Dean Humphrys, Tanya Humphrys, T & H Enterprises, LLC, Hum-

phrys Enterprises, LLC, and Pat Stapleton, Receiver, to First Tennessee's Motion for Summary Judgment. Pursuant to E.D.Tenn. LBR 7007–1, these Defendants are therefore deemed to not oppose this Motion.

First Tennessee's Complaint is a core proceeding. 28 U.S.C.A. § 157(b)(2)(K) (West 1993). The core/noncore nature of Coffman Oil's proposed counterclaim will be discussed herein.

## I

On March 10, 1999, by execution of the Lease, the Landlord conveyed to Dean Humphrys and the Debtor, as "Tenant," a leasehold interest (the Leasehold) in real property (the Leased Premises) located in Sevier County, Tennessee. The Debtor and Humphrys have utilized the Leased Premises to operate, either directly or through closely-held business entities, an A & W restaurant, an Amoco convenience store, and a Subway restaurant.

On February 15, 1999, the Debtor and Humphrys entered into a Supply Agreement with Coffman Oil for the provision of Amoco gasoline. The Supply Agreement references the Lease, providing in material part:

14. This Supply Agreement will run concurrently with [the] 50 year lease negotiated between tenants John Dale Trotter and Dean Humphrys and [the Landlord], dated February 15, 1999, and this Agreement shall in no wise [sic] be terminated or cancelled unless said lease shall be terminated. One of the considerations for Company [Coffman Oil] entering into said lease is Dealer's agreement to execute this Supply Agreement, and Company [Coffman Oil] would not have agreed to said lease in the absence of this Supply Agreement.[3]

The Supply Agreement is in turn referenced at Section 10.17 of the Lease, which states:

This lease has been executed in conjunction with a Supply Agreement (between Coffman Oil Company and the Lessees, Tenants herein) and a part of the consideration for Dallas Coffman and Jean Coffman entering into this Lease Agreement is the agreement by the Tenants herein entering into said Supply Agreement dated 15 February, 1999, and made between Coffman Oil Co., Inc., and John Dale Trotter and Dean Humphreys [sic], Dealer.

An Agreed Order was entered by the court on June 13, 2001, in the bankruptcy cases of the Debtor and Trotter Enterprises, LLC. Each Order authorized assumption of the Lease by the respective Debtor and provided that the Supply Agreement was also assumed by each Debtor.[4] The Orders also provided that the rights of First Tennessee were reserved and unaffected by the assumptions or the Orders.

On July 16, 1999, the Debtor, his wife, Karen Trotter, Dean Humphrys, and his wife, Tanya Humphrys, executed a Tennessee Leasehold Deed of Trust conveying the interest of the Debtor and Humphrys in the Lease and Leasehold as security for obligations of the Trotters and the Humphrys to First Tennessee. Contemporaneously with the execution of the Tennessee Leasehold Deed of Trust, First Tennessee and the Landlord executed a Landlord's Agreement and a Landlord's Waiver and Subordination. Both documents relate to First Tennessee's rights relative to the Leasehold and Leased Premises.[5] The

---

3. References in this paragraph to the "Company," i.e., Coffman Oil, entering into the "[L]ease" are erroneous. Coffman Oil was not a party to the March 10, 1999 Lease.

4. Trotter Enterprises, LLC is a sub-sublessee of a portion of the Leasehold Premises.

5. By the Landlord's Waiver and Subordination, the Landlord subordinated its interest in certain goods and fixtures on the Leased Premises to the interest of First Tennessee.

Landlord's Agreement provides in material part at paragraph 5:

> Landlord agrees that as long as Landlord receives in a timely fashion all rental payments as and when due, and as long as the obligations of the tenant to maintain the Premises are being fulfilled[ ] (whether by Borrower or Lessee or, at its option, Lender or any transferee of Lender), Landlord will not terminate the Lease or take any action to require Borrower [or] Lender or Lender's transferee to surrender possession of the Premises.

The Landlord's Agreement further recites that it is executed "in order to induce Lender to extend financial accommodations to Borrower," and does not reference the Supply Agreement.

## II

First Tennessee moves for judgment on the pleadings pursuant to FED.R.CIV.P. 12(c) and FED.R.BANKR.P. 7012 or, in the alternative, for summary judgment under FED.R.CIV.P. 56 and FED.R.BANKR.P. 7056. Rule 12(c) provides:

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

FED.R.CIV.P. 12(c). Because the Affidavit of Dallas Coffman (a "matter outside the pleadings") has been filed by the Coffman Defendants in opposition to the Motion for Summary Judgment, the court will address the Motion as one for summary judgment.[6] *See id.*

Under Rule 56(c), summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The nonmovant bears the burden of producing specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing FED.R.CIV.P. 56(e)). The facts, and all inferences to be drawn from them, must be viewed in the light most favorable to the nonmovant. *See Matsushita,* 106 S.Ct. at 1356, 106 S.Ct. 1348. The court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In so doing, the court must decide whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 2512, 106 S.Ct. 2505.

## III

■ The parties are not in disagreement over the factual issues of this case. Instead, their dispute centers around the interpretation and interplay of the Supply Agreement, the Lease, and the Landlord's Agreement. The court's interpretation of a written contract is a question of law.

---

**6.** Additionally, all documents essential to a resolution of First Tennessee's Motion for Summary Judgment are appended to its Complaint. The authenticity of these documents is not in dispute.

*See Realty Shop, Inc. v. RR Westminster Holding, Inc.,* 7 S.W.3d 581, 597 (Tenn.Ct. App.1999).

First Tennessee asserts that in the event it forecloses on the Lease, neither it nor its subsequent transferee should be required to comply with the Supply Agreement or pay attorney's fees owed by the Debtor to the Landlord as a condition of curing a default or to maintain the existence of the Lease. In support of this theory, First Tennessee points out that the Landlord's Agreement expressly requires only timely rental payments to the Landlord and fulfillment of "the obligations of the tenant to maintain the Premises." Because compliance with the Supply Agreement and payment of attorney's fees are not set forth as conditions of default under the Landlord's Agreement, First Tennessee contends that it is not bound by either obligation.

The Coffman Defendants counter that First Tennessee was at all times aware of the Supply Agreement and should be required to comply with it in the event of foreclosure. They additionally cite Section 10.03(h) of the Lease, which provides that in the event of foreclosure by a secured party, that party must agree to assume all of the tenant obligations under the Lease. Such obligations, according to the Coffman Defendants, include compliance with the Supply Agreement and payment of their attorney's fees owed by the Debtor.

■ Under Tennessee law, a contract is prima facie evidence of "the true intentions of the parties [ ] and shall be enforced as written[.]". TENN.CODE ANN. § 47–50–112(a) (1995). In construing contracts, Tennessee courts give to the words expressing the parties' intentions their "usual, natural and ordinary meaning." *Ballard v. North Am. Life & Cas. Co.,* 667 S.W.2d 79, 82 (Tenn.Ct.App.1983). "In the absence of fraud or mistake, a contract must be interpreted and enforced as written even though it contains terms which may be thought harsh and unjust." *Id.*

To avoid default, the Landlord's Agreement expressly requires only that First Tennessee, or its foreclosure transferee, make "in a timely fashion all rental payments" and fulfill "the obligations of the tenant to maintain the Premises." The Coffman Defendants have offered no plausible theory under which compliance with the Supply Agreement or payment of attorney's fees would be considered either a "rental payment" or an obligation "to maintain the Premises." [7] Accordingly, the court finds that in the event of foreclosure, neither noncompliance with the Supply Agreement nor failure to pay the Defendants' attorney's fees owed by the Debtor would be cause for default by First Tennessee or its subsequent transferees.

■ However, this finding does not end the court's inquiry if, as urged by the Coffman Defendants, the Lease and Supply Agreement must be construed together as one contract. For example, while noncompliance with the Supply Agreement would not be a condition of default for First Tennessee, the Coffman Defendants could still bring an action for damages resulting from the breach of the Supply Agreement—but only if the two documents can be construed as a single contract.

The construction of related contracts has been explained as follows:

Generally, absent evidence to the contrary, instruments executed contempora-

7. The Debtor's and Humphrys' obligation to pay rent is governed by Article III of the Lease; their obligation to maintain the Leasehold Premises is governed by Article VII at Section 7.03; and their obligation to pay attorney fees is governed by Article X at Section 10.09.

neously with commonality of parties, purpose, and transaction will be construed together in the eyes of the law as one contract. Construing contemporaneous instruments together simply means that if there are any provisions of one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect as between the parties; and others charged with notice, so that the intent of the parties may be carried out.

*Pyramid Operating Auth., Inc. v. City of Memphis (In re Pyramid Operating Auth., Inc.),* 144 B.R. 795, 814 (Bankr. W.D.Tenn.1992) (citing *Joy v. City of St. Louis,* 138 U.S. 1, 11 S.Ct. 243, 34 L.Ed. 843 (1891)); *accord Farmer v. Autorics, Inc. (In re Branam),* 247 B.R. 440, 445 (Bankr.E.D.Tenn.2000); *cf., Harrell v. Dean Food Co.,* 619 S.W.2d 528, 533 (Tenn. Ct.App.1981) (Where the parties intend for two separate instruments to constitute a single contract, they should either "say so or draw one instrument.").

"Commonality" is defined as "possession of common features or attributes." WEBSTER'S NEW COLLEGIATE DICTIONARY 225 (1st ed.1979). "Contemporaneously" is defined as "originating during the same time [or] the same period of time." *Id.* at 242.

In the present case, the Lease was executed approximately one month after the signing of the Supply Agreement. The parties to the documents are not identical. Although the Coffmans and the Greens, the Landlord, were parties to the Lease, they were not parties to the Supply Agreement. Dallas Coffman, by Affidavit, states that he is president of Coffman Oil and that both the Coffmans and the Greens receive a portion of the Supply Agreement revenue. Nonetheless, Coffman Oil, a corporation, is a separate legal entity. Furthermore, neither the Lease nor the Supply Agreement were recorded. However,

pursuant to TENN.CODE ANN. § 66–24–101(a)(15) (Supp.2000), a Memorandum of Lease was recorded in the Sevier County Register of Deed's Office on March 18, 1999. This document contains no mention of the Supply Agreement. That the Lease states that it is executed "in conjunction with" the Supply Agreement is not dispositive. *See Wright Med. Tech., Inc. v. Orthomatrix, Inc.,* No. W2000–02744–COA–R3–CV, 2001 WL 523992 at *6 (Tenn.Ct. App. May 17, 2001) (The "conjunction" of two agreements does not amount to a merger.).

The court cannot construe the Lease and Supply Agreement as a single contract. The Landlord is not a party to the Supply Agreement, and the Lease, other than the phrase at Section 10.17 that "the [L]ease has been executed in conjunction with the Supply Agreement," contains no language that can be construed to incorporate the Supply Agreement into its terms. Furthermore, the lack of the commonality of parties precludes the court from considering the Lease and Supply Agreement together. *See Pyramid Operating Auth.,* 144 B.R. at 814.

In summary, the interest of the Defendants in the Leasehold Premises is subject to the interest of First Tennessee arising under the Tennessee Leasehold Deed of Trust. Additionally, pursuant to the Landlord's Agreement, First Tennessee and any foreclosure transferee are not required to comply with the Supply Agreement nor are they required to pay the Landlord's attorney's fees. The only action required by First Tennessee and its transferees to maintain the existence of the Lease is, as required by paragraph 5 of the Landlord's Agreement, to make "all rental payments" in a "timely fashion" and to "maintain the Premises."

Because there is no genuine issue of material fact, First Tennessee's Motion for Summary Judgment will be granted.

## IV

■ Lastly, the Coffman Defendants' Motion must be denied for lack of subject matter jurisdiction. The proposed counterclaim arises from an Incentive Contract dated November 29, 1999, between Coffman Oil and Trotter Enterprises, along with an Addendum to Incentive Contract dated March 10, 2000, between Coffman Oil, Trotter Enterprises, and First Tennessee. Through the Incentive Contract, Coffman Oil agreed to transfer up to $35,000.00 in Amoco Oil Company rebates to Trotter Enterprises. By the Addendum, the $35,000.00 was instead transferred to First Tennessee.

The Coffman Defendants offer their counterclaim under two theories. First, they assert that First Tennessee, through the Addendum and the receipt of $35,000.00, "impliedly promised to refrain from taking any action which would jeopardize the continued operation of the Amoco franchise." The Coffman Defendants' second theory alleges an implied agreement by First Tennessee to act with good faith and fair dealing toward Coffman Oil. The Coffman Defendants assert that First Tennessee's attempt to avoid the Supply Agreement breaches each of these implied agreements, thereby making the Bank liable for repayment of potentially the entire $35,000.00 to Coffman Oil.

The court's jurisdiction over matters involving nondebtors is governed by 28 U.S.C.A. § 1334. *See Michigan Employment Sec. Comm'n v. Wolverine Radio Co., Inc. (In re Wolverine Radio Co.),* 930 F.2d 1132, 1140 (6th Cir.1991). Section 1334 provides in material part:

(a) Except as provided in subsection (b) of this section, the district court shall have original and exclusive jurisdiction of all cases under title 11.

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

28 U.S.C.A. § 1334(a)–(b) (West 1993). Section 1334 thereby grants jurisdiction to the district courts over four types of bankruptcy matters: (1) "cases under title 11"; (2) "proceedings arising under title 11"; (3) "proceedings ... arising in ... cases under title 11"; and (4) "proceedings ... related to cases under title 11." *See id.; Wolverine Radio,* 930 F.2d at 1141.

■ If a district court has jurisdiction under § 1334, 28 U.S.C.A. § 157 then defines the bankruptcy court's jurisdiction over the same matter. *Wolverine Radio,* 930 F.2d at 1143–44. Section 157(b)(1) provides:

Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

28 U.S.C.A. § 157(b)(1) (West 1993). Therefore, outside of the bankruptcy case itself, the bankruptcy court may enter final orders and judgments only in "core proceedings arising under title 11, or arising in a case under title 11[.]" *Id.; see also Wolverine Radio,* 930 F.2d at 1144 (citing *Wood v. Wood (In re Wood),* 825 F.2d 90, 95 (5th Cir.1987)).

The Bankruptcy Code sets forth a non-exclusive list of core proceedings.[8] The proposed breach of contract counterclaim, involving two nondebtors, is not a core proceeding. *See Wolverine Radio*, 930 F.2d at 1144 ("[I]f the proceeding does not invoke a substantive right created by federal bankruptcy law and is one that could exist outside of the bankruptcy, then it is not a core proceeding.").

■■ Nonetheless, the court may still hear a matter that "is otherwise related to a case under title 11." 28 U.S.C.A. § 157(c)(1). The Sixth Circuit has adopted the following test for "related to" jurisdiction:

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy.* Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to

bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*Robinson v. Michigan Consol. Gas Co., Inc.,* 918 F.2d 579, 583 (6th Cir.1990) (quoting *Pacor, Inc. v. Higgins (In re Pacor, Inc.),* 743 F.2d 984, 994 (3rd Cir. 1984) (emphasis in original) (citations omitted)). Thus, "related to" jurisdiction may extend to actions involving nondebtor parties, but only where the suit has "an effect on the bankruptcy estate." *Celotex Corp. v. Edwards,* 514 U.S. 300, 115 S.Ct. 1493, 1498–99 n. 5, 131 L.Ed.2d 403 (1995).

At oral argument, counsel for the Coffman Defendants correctly conceded that the proposed counterclaim is not "related to" the Debtor's bankruptcy case. Accordingly, because the counterclaim is neither a core matter nor "related to" the bankruptcy, the court is without subject matter jurisdiction. 28 U.S.C.A. § 157(b)–(c). The Motion must therefore be denied.

---

**8.** Core proceedings include, but are not limited to—

(A) matters concerning the administration of the estate;

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

(C) counterclaims by the estate against persons filing claims against the estate;

(D) orders in respect to obtaining credit;

(E) orders to turn over property of the estate;

(F) proceedings to determine, avoid, or recover preferences;

(G) motions to terminate, annul, or modify the automatic stay;

(H) proceedings to determine, avoid, or recover fraudulent conveyances;

(I) determinations as to the dischargeability of particular debts;

(J) objections to discharges;

(K) determinations of the validity, extent, or priority of liens;

(L) confirmations of plans;

(M) orders approving the use or lease of property, including the use of cash collateral;

(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate; and

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.
28 U.S.C.A. § 157(b)(2) (West 1993).

An order consistent with this Memorandum will be entered.

### ORDER

Pursuant to the Memorandum on Motion for Summary Judgment and Motion to Amend Answer filed this date, the court directs the following:

1. The Motion to Amend Answer and File Permissive Counter–Claim filed by the Defendant Coffman Oil Company on August 3, 2001, is DENIED.

2. The Motion for Judgment on the Pleadings and/or for Summary Judgment and for Scheduling Order filed by the Plaintiff on August 2, 2001, is, to the extent summary judgment is requested, GRANTED.

3. The interest asserted by each of the thirteen Defendants in the leasehold estate described in Article I at Section 1.01 of the Lease Agreement entered into on March 10, 1999, by the Defendants Bill Green, Claudine Green, Dallas Coffman, and Jean Coffman, as "Landlord," and the Defendants John Dale Trotter and Dean Humphrys, as "Tenant," is subject to the first priority security interest of the Plaintiff arising under the Tennessee Leasehold Deed of Trust executed on July 16, 1999, by the Defendants John Dale Trotter, Karen Tudor Trotter, Dean Humphrys, and Tanya Humphrys, as "Grantor," and Jason C. Rose, Trustee.

4. Pursuant to the Landlord's Agreement entered into on July 16, 1999, by the Defendants Dallas Coffman, Jean Coffman, Bill Green, and Claudine Green, as "Landlord," and the Plaintiff, as "Lender," the Plaintiff and/or its transferees are not required to pay the attorney fees called for under Article X, Section 10.09, of the March 10, 1999 Lease Agreement. The Defendants Dallas Coffman, Jean Coffman, Bill Green, and Claudine Green can terminate their March 10, 1999 Lease Agreement with the Defendants John Dale Trotter and Dean Humphrys only in the event they do not receive from the Defendants John Dale Trotter and Dean Humphrys or from the Plaintiff and/or its transferees "in a timely fashion all rental payments as and when due" under Article III of the Lease Agreement and/or the Defendants John Dale Trotter and Dean Humphrys or the Plaintiff and/or its transferees fail to meet the "obligations of the Tenant to maintain the Premises" as required under Article VII of the Lease Agreement.

5. The Supply Agreement entered into on February 15, 1999, by the Defendant Coffman Oil Company, as "Company," and the Defendants John Dale Trotter and Dean Humphrys as "Dealer," is not part of the March 10, 1999 Lease Agreement entered into between the Defendants Bill Green, Claudine Green, Dallas Coffman, and Jean Coffman, as "Landlord," and the Defendants John Dale Trotter and Dean Humphrys, as "Tenant," and the Plaintiff and/or its transferees are not required to comply with the terms of the Supply Agreement to preserve their interest in the Lease Agreement.

SO ORDERED.